# Commonwealth *v.* Elizabeth Hufnal, Appellant.

*Food law—Skimmed milk—Act of June 26, 1895—Criminal law.*

"Skimmed milk" is the generic term by which is meant milk from which its natural cream has been taken in part or in whole. The process of removing the cream is a mere incident, and the result in the product is a difference only in the proportion of the cream or fatty constituents left in it, a difference of quality only, and not greater, as appears, than that in milk skimmed once, or skimmed twice, in the old-fashioned way, and after twelve hours', or after twenty-four hours' setting. It is not, therefore, an indictable offense under the Act of June 26, 1895, P. L. 317, entitled "An act to provide against the adulteration of food," etc., to sell, as "skimmed milk," milk from which the cream or butter fat has been taken by the centrifugal or "separator" process.

Argued Jan. 7, 1896. Appeal, No. 219, Jan. T., 1897, by defendant, from judgment of Superior Court, Nov. T., 1896, No. 143, affirming judgment of Q. S. Phila. Co., Nov. T., 1895, No. 256, on verdict of guilty. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Indictment for selling food alleged to be adulterated.

The material portion of the indictment and the facts of the case appear by the report of the case in 4 Pa. Superior Ct. 301.

*Error assigned* was in affirming the judgment of the quarter sessions of Philadelphia county.

*Wm. Righter Fisher*, for appellant.—The one question to which the whole controversy converges is, whether the act of June 26, 1895, by any allowable construction which can be placed upon it, prohibits the sale of centrifugally separated, or separator-skimmed milk, under the specific destination of skimmed milk, or to state the proposition more broadly, whether the prohibitions of the act apply in any case to milk, sold as skimmed milk, from which all or any part of the cream, or butter fat, has been removed by any process whatsoever, which leaves the milk otherwise unimpaired in quality so long as such milk is wholesome, pure and measures up to whatever specific standard the legislature may have prescribed.

Penal statutes are to be construed strictly: U. S. v. Wiltberger, 5 Wheat. 76; Bucher v. Com., 103 Pa. 529; Warner v. Com., 1 Pa. 154; United States v. Kirby, 7 Wall. 482.

In determining what is the general object of the legislature, or the meaning of its language in any particular passage, that intention and that meaning which appears to be most agreeable to convenience, justice and reason, should in all cases open to doubt be presumed to be the true one: 2 Bishop on Statutory Crimes, 82; 1 Kent's Commentaries, *462; Texas & Pacific Ry. v. Interstate Commerce Com., 162 U. S. 197; United States v. Fisher, 2 Cranch, 358; Phila. v. Ridge Ave. Ry., 102 Pa. 190; Oates v. First Nat. Bank, 100 U. S. 239; Reiche v. Smythe, 13 Wall. 162; United States v. Union Pacific R. R. Co., 91 U. S. 72; Aldridge v. Williams, 3 How. 10; Murray v. Gibson, 15 How. 421; Hines v. R. R. Co., 95 N. C. 434; Vane v. Vane, L. R. 8 Ch. App. Cas. 383; Clohessy v. Roedelheim et al., 99 Pa. 56.

It is a principle of our legal system, that the essence of any offense is the wrongful intent, without which it cannot exist.

If the merely nominal difference between the gravity and centrifugal methods of raising the cream and removing it from the surface of the milk be not the true basis of the decisions of the lower courts nothing seems to be left for them to rest upon but the proposition that the definitions and prohibitions of the act of 1895 are directed against a mere variation in quality, which finds its analogue in almost every article of commerce.

The act of June 26, 1895, had its origin in an essay upon food and drug adulteration by Geo. W. Wigner, a distinguished analyst of England. See Analyst of January, 1881, pp. 3–9, Report of National Board of Trade, 1880, p. 75.

*Samuel A. Boyle,* assistant district attorney, with him *George S. Graham,* district attorney, for appellee.

OPINION BY MR. JUSTICE MITCHELL, April 11, 1898:

The appellant was indicted under the Act of June 26, 1895, P. L. 317, entitled "an act to provide against the adulteration of food," etc., and the offense charged was selling as "skimmed milk," milk from which the cream had been taken by the centrifugal or "separator" process. The word adultera-

tion in its ordinary and proper sense means the corruption, debasing or making impure by the admixture of a foreign or inferior substance or ingredient: Century Dictionary; Oxford New English Dict.; Webster's International, ed. 1893. It was therefore incumbent on the commonwealth to prove that the word was used in the statute in a sense different from its ordinary meaning, and sufficient to cover the act charged as a violation. This the commonwealth undertook to do by reference to the third subdivision of section 3, as follows: "Sec. 3. An article shall be deemed to be adulterated within the meaning of this act: (a) In the case of food; . . . . (3) If any valuable or necessary constituent or ingredient has been wholly or in part abstracted from it." The facts were not really in dispute, and showed that there were in common use three methods of separating. the cream from the whole milk, first, the immemorial "skimming" by setting the milk in shallow vessels and allowing the cream to rise and then removing it by a sliding motion of a paddle or dipper; secondly, the "Cooley" process of setting the milk in deep vessels, subjecting it to rapid cooling and then drawing off the heavier watery ingredients from the bottom; and thirdly, the centrifugal method by which the milk is subjected to a rotary motion with very high velocity which separates the watery ingredients from the cream by reason of their greater specific gravity. All three of these methods are alike in being mechanical only and dependent on the difference in gravity between the cream and the other constituents. It was admitted that the milk sold by the appellant was produced by the third process; that it was sold under the name of skimmed milk, plainly so marked; and it was not charged that any other substance was mixed with it. But the commonwealth claimed that by the centrifugal process a much larger proportion of the cream, or butter fat, amounting practically to the whole of that component was removed from the milk, than by the ancient process which alone could rightfully be called skimming, and that therefore the milk was "adulterated" in the statutory sense, by having a "valuable or necessary constituent or ingredient wholly or in part abstracted from it." The learned judge of the quarter sessions, and the majority of the Superior Court took this view, but we are of opinion that it was erroneous.

The act in question deals with the affairs of everyday life,

and is highly penal in its provisions. There is therefore double reason why its language should be construed according to its popular practical everyday use among the people. It may be conceded that the word "skim" or "skimming" has not materially changed from its long established meaning, and that it refers to a process substantially the same, whether performed with a southern plantation gourd, a big New Jersey clam shell, or a modern patent tin skimmer. When, however, we come to name the product, the process becomes a mere incident, and the substantial subject is the difference in qualities between the article in its original and in its subsequent state. The cream does not change its name although under the new process it is more exclusively composed of the butter fat than under the old. So it is with the residuum of skimmed milk. Milk is only one of the thousand things that may be skimmed, though it is undoubtedly one of the first and most universal to which the name and the process were applied, and popular use, the "jus et norma loquendi" of Horace, has preserved the name of the process even though the implements employed have varied. So the practical commonsense of the people in dealing with the product has looked to substance rather than mere process, and has called milk from which the cream has been taken, by its ancient name of "skimmed milk," without regard to whether the cream was "skimmed" in the primitive or abstracted in a more modern way. The dictionaries support this definition of the word: "The milk from which the cream is separated is skimmed milk," Century Dict. sub verb. milk; "skim milk, milk from which the cream has been taken," Webster, ed. 1893; "skim milk, milk from which the cream has been removed," Standard Dict.

We believe this is the popular understanding and use of the term "skimmed milk," and we find a notable instance of it in the testimony even of the witnesses for the commonwealth in this case. The chief inspector of milk, strenuous as he was to show that the milk sold by appellant was not "skimmed" but "adulterated," has continual recourse to the phrase "separator-skimmed," and the chemist, in testifying to the results of analysis, constantly uses the terms "hand-skimmed" and "so-called separator-skimmed." Nor are we without legislative usage to the same effect. The Act of June 10, 1881, P. L.

116, " to protect the manufacturers of butter and cheese," makes it a penal offense to sell to any such manufacturer, with intent to defraud, any milk diluted with water, or adulterated, uncleanly or impure milk, or " any milk from which the cream has been taken, or milk commonly known as skimmed milk."

We are constrained to hold therefore that skimmed milk is not adulterated milk even within the very broad and peculiar meaning of the word adulterated in the act of 1895. Undoubtedly if sold as "whole milk," or even as "milk," without any descriptive epithet, it would be within the statute, as milk from which a valuable constituent had been abstracted. But even though it has lost its most valuable ingredient, skimmed milk is still a useful and important article of consumption and its sale has never been prohibited. When sold candidly under its own name there is nothing legally or morally wrong in the transaction. And " skimmed milk " we understand to be the generic term by which is meant milk from which its natural cream has been taken in part or in whole. The process is a mere incident, and the result in the product is a difference only in the proportion of the cream, or fatty constituents left in it, a difference of quality only, and not greater as appears than that in milk skimmed once or skimmed twice in the old-fashioned way, and after twelve hours' or after twenty-four hours' setting.

It is conceded that the centrifugal method takes out a larger proportion of the cream than the other processes, and it is suggested that it should properly be called "separator milk," as in fact it was by some of the witnesses in this case, though the most intelligent or best educated of them used the qualifying phrase " so-called " to indicate that it was not a commonly recognized term. There may not improbably come a time when the variations in the quality of skimmed milk shall receive popular recognition and differentiation by name, but whether the product of the old method or the new shall retain the old name is something that neither jurist nor philologist can foretell. This is an age of mechanical and industrial revolution, and all of us who have passed middle life have seen an entire change in the methods and processes of production in nearly everything that we use in our daily life. Nearly everything that in our youth was made singly by the individual mechanic, is made now in thousands or millions by machinery in the factory. In

some cases the newcomer has had to take a distinctive title, while in others he has elbowed out his predecessor and appropriated his name.  Our fathers' carpenters made the doors and window sashes for each house separately, and when the new order of wholesale making was introduced it had to call itself "mill-work."  The latter has certainly come out victor in popular use.  Whether it has triumphed also in the language I do not know, but I suspect that the citizen who wants a house furnished with doors and sashes made in the old way will have to specify that he wants them "hand made," and insist pretty strongly before he gets them.  His grandfather would have had no such necessity of defining his wants.  There may come a time when popular use will differentiate skimmed milk into "separator" and "hand skimmed" or similar terms of classification, but there is no such use now and none can be adopted by anticipation for the construction of a penal statute.

The Act of July 7, 1885, P. L. 260, has no applicability to this case, and the references to it by the expert witnesses were irrelevant and erroneous.

Most of the assignments of error must be overruled, and it is not necessary to discuss them in detail.  But the fifteenth, which covers the defendant's point that the third clause of the third section of the act does not apply to separator skimmed milk when sold as skimmed milk, must be sustained.  The point should have been affirmed.

On the undisputed facts of the case the jury should have received a binding direction to find a verdict of not guilty.

Judgment reversed, and appellant is discharged without day,