No. 98-034

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 280

MONICA R. SMITH,

Plaintiff and Appellant,

v.

GENERAL MILLS, INC.,

a corporation,

Defendant and Respondent.

APPEAL FROM: District Court of the Twelfth Judicial District,

In and for the County of Liberty,

Honorable John Warner, Judge Presiding.

COUNSEL OF RECORD:

For Appellant:

Keith A. Maristuen and John F. Jenks, Bosch, Kuhr, Dugdale,

Martin and Kaze, Havre, Montana

For Respondent:

K. Dale Schwanke, Jardine, Stephenson, Blewett and Weaver,

Great Falls, Montana

Argued: September 29, 1998

Submitted: October 20, 1998

Decided: November 17, 1998

Filed:

No

_____

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

**¶1. Monica R. Smith (Monica) appeals from the order of the Twelfth Judicial District Court, Liberty County, denying her post-trial motions in an action filed by her against General Mills, Inc. (General Mills), for conversion of funds and breach of contract. Monica also appeals from the ruling of the District Court that General Mills was not barred from seeking enforcement of a separate contract under the Uniform Commercial Code's statute of frauds. We affirm.**

## ISSUES

**¶2. 1. Did the District Court err in holding that John Smith was a "merchant" for purposes of applying the exception to the statute of frauds found under § 30-2-201(2), MCA?**

**¶3. 2.** Did the District Court err in failing to enter judgment as a matter of law?

**¶4. 3. Did the District Court err in denying Monica's motion for an award of court costs?**

## BACKGROUND

**¶5. Monica and her husband operated a farm north of Chester, Montana (the Smith farm or the farm), from 1945 until his death in 1984. After their father's death,**

Monica's sons, Frank Smith (Frank) and John Smith (Jack) operated the farm as partners for a number of years. Eventually, Jack went on to pursue other occupations, and Frank continued to operate the farm on his own. Frank died in 1993, leaving Monica as his sole heir. Monica nominated Jack as the personal representative of Frank's estate.

¶6. During 1993 and part of 1994, Jack operated the Smith farm under a lease from Frank's estate. Some of the land had been seeded with spring wheat prior to Frank's death, and this crop was harvested by Jack in 1993. Unfortunately, the 1993 spring wheat crop was damaged by frost and so became marketable only as feed wheat. After harvesting the 1993 crop, Jack placed approximately 21,000 bushels of the feed wheat into storage on the farm. Although the 1993 feed wheat belonged to Monica, Jack was authorized to sell the wheat on her behalf at such times and at such prices as he deemed appropriate.

¶7. It was alleged by General Mills, and the jury in this case so found, that on August 12, 1994, Jack, acting as an agent on behalf of Monica during the course of a telephone conversation between Jack and the manager of General Mills' Joplin, Montana, grain elevator, entered a contract for the sale of the feed wheat to the Joplin elevator for a price of $2.55 per bushel (hereinafter the Joplin elevator contract or Joplin contract). Following this conversation, a written agreement confirming the terms of this contract was prepared and mailed to Jack. Although Jack admitted receiving the contract, he did not execute or return it to the Joplin elevator. Jack later denied the existence of the Joplin contract, and ultimately sold the feed wheat to General Mills' Tiber, Montana, grain elevator for $3.00 per bushel under a contract formed on September 16, 1994 (hereinafter the Tiber elevator contract or Tiber contract).

¶8. The controversy between these parties arose when General Mills withheld $15,000 out of the payment issued to Monica on the Tiber elevator contract, asserting that due to Jack's breach of the Joplin elevator contract, General Mills was entitled to an offset of the difference on the two contracts. In an effort to recover the withheld payment, Monica filed this complaint against General Mills alleging conversion of the funds or, in the alternative, breach of the Tiber elevator contract. General Mills counterclaimed, asserting that Monica, through her agent, Jack, was in breach of the Joplin elevator contract, and that General Mills was therefore entitled to offset the debt it owed to Monica on the Tiber contract by the amount of damages it sustained

through nonperformance of the Joplin contract. Monica responded by asserting that enforcement of the Joplin contract was barred by the statute of frauds, because Jack had never signed the contract mailed to him by the Joplin elevator.

¶9. At the close of the evidence in a jury trial on the merits, the District Court ruled as a matter of law that enforcement of the Joplin elevator contract was not barred by the statute of frauds under the Uniform Commercial Code's "merchant exception" to the statute of frauds. All other issues were submitted to the jury, and a verdict was issued in favor of General Mills. Findings of fact set forth in the jury's special verdict include a finding that Jack had entered into a contract with General Mills' Joplin elevator on behalf of Monica for the sale of 20,000 bushels of feed wheat, that this contract was breached when Jack refused to deliver the grain, and that under the terms of the contract, General Mills was entitled to cancel the contract and recover the cost of pricing out that contract at the market price for feed wheat as of the time of cancellation. At the close of trial, Monica filed a motion for new trial, or in the alternative for a judgment as a matter of law, and for an award of court costs. The District Court denied both of Monica's motions, and this appeal followed.

DISCUSSION

¶10. Did the District Court err in holding that John Smith was a "merchant" for purposes of applying the exception to the statute of frauds found under § 30-2-201(2), MCA?

¶11. Whether or not a person qualifies as a merchant under the Uniform Commercial Code is a mixed question of law and fact. *See Dawkins & Co. v. L&L Planting Co.* (Miss. 1992), 602 So.2d 838, 843. Our standard of review as to conclusions of law, questions of law, legal components of ultimate facts, or mixed questions of law and fact is whether the lower court's determination of law is correct. *Maguire v. State* (1992), 254 Mont. 178, 182, 835 P.2d 755, 757-58.

¶12. Section 30-2-201, MCA, sets forth the statute of frauds governing contracts for the sale of goods in Montana. The general provision of that statute reads in pertinent part:

Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or

broker.

Section 30-2-201(1), MCA. Section 30-2-201(2), MCA, commonly referred to as the "merchant exception" to the statute of frauds, abrogates the requirement that a contract be in writing to be enforceable when the contract is between merchants:

Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

Section 30-2-201(2), MCA. The term "merchant" is defined by § 30-2-104(1), MCA, as

a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

**¶13. Although the question of whether a farmer may be deemed a merchant for purposes of § 30-2-201(2), MCA, is a matter of first impression for this Court, there are a number of other jurisdictions which have had occasion to address it. Despite the split of authority on this issue, a majority of courts have held that under the Uniform Commercial Code, a farmer may be included under the definition of "merchant" in some instances.** *See, e.g., Prenger v. Baker* **(Iowa 1995), 542 N.W.2d 805;** *Dawkins & Co.*, **602 So.2d at 838;** *Colorado-Kansas Grain Co. v. Reifschneider* **(Colo. App. 1991), 817 P.2d 637;** *Burkhart v. Marshall* **(Ohio App. 1989), 578 N.E.2d 827;** *Goldkist, Inc. v. Brownlee* **(Ga. App. 1987), 355 S.E.2d 773;** *Agrex, Inc. v. Schrant* **(Neb. 1986), 379 N.W.2d 751;** *Nelson v. Union Equity Co-op. Exchange* **(Tex. 1977), 548 S.W.2d 352. However, whether a particular farmer qualifies as a merchant cannot be determined through application of a** *per se* **rule; rather, it is a conclusion that must be reached on a case by case basis.** *Pierson v. Arnst* **(D. Mont. 1982), 534 F. Supp. 360, 362;** *Rush Johnson Farms, Inc. v. Missouri Farmers Ass'n., Inc.* **(Mo. App. 1977), 555 S.W.2d 61, 65.**

**¶14. The facts relied upon by the District Court in its determination that Jack was a merchant subject to the "merchant exception" to the statute of frauds were explicitly**

set forth in the record by the District Court and were not in substantial dispute at trial. Among the considerations given weight by the District Court were the fact that Jack had an operative knowledge of the grain marketing system, including how the buying and selling worked, how competition moved the market, and what factors affected price. He was familiar with all facets of marketing the grain, including knowledge of the product, how to produce it, how to store it, where and how to sell it, and how to negotiate the best terms possible for its disposition. Jack's experience in marketing grain spanned a period of many years, and he had even been entrusted with the marketing of grain in a fiduciary capacity for his mother and his brother's estate. Furthermore, Jack acknowledged in writing as part of the Tiber elevator contract that he was a merchant for purposes of marketing the grain he produced.

¶15. Our review of the record supports the District Court's conclusion that Jack was a dealer in grain or otherwise by his occupation held himself out as having knowledge or skill peculiar to the marketing of grain. We therefore affirm the ruling of the District Court that the confirmation sent to Jack by the Joplin elevator was sufficient to satisfy the statute of frauds under § 30-2-201(2), MCA.

¶16. Did the District Court err in failing to enter judgment as a matter of law?

¶17. Our standard of review of denial of a motion for judgment as a matter of law under Rule 50(b), M.R.Civ.P., is whether substantial evidence supports the verdict of the jury. *Kapner, Wolfberg & Assoc. v. Blue Cross* (1995), 270 Mont. 283, 285, 891 P.2d 530, 532. Substantial credible evidence is evidence which a reasonable mind might accept as adequate to support a conclusion. *Kneeland v. Luzenac America, Inc.*, 1998 MT 136, ¶ 45, ___ P.2d ___, 55 St.Rep. 541, ¶ 45. Upon reviewing a jury verdict the evidence must be viewed in the light most favorable to the prevailing party. *Kneeland*, ¶ 45.

¶18. Monica contends that the evidence in this case does not support the jury's findings that an oral contract existed between Jack and General Mills' Joplin elevator. We disagree. Jack's testimony indicates that on the day the oral contract was formed he was out in the field combining barley, and so could not have placed the phone call to the Joplin elevator for the sale of the feed wheat. However, the testimony of the manager of the Joplin elevator was that Jack did in fact place such a call and that a contract was negotiated on that day. Furthermore, the secretary at the Joplin elevator testified that she overheard the telephone conversation between Jack

and the elevator manager and shortly thereafter prepared the contract documents in conformity with the substance of the conversation.

¶19. The jury's findings in this instance are dependent upon a determination of the credibility of each of these witnesses. When conflicting evidence exists, it is the province of the jury to judge the credibility and weight of the evidence; this Court will not retry a case or reweigh evidence on appeal. *Kneeland*, ¶ 45; *Fox Grain and Cattle Co. v. Maxwell* (1994), 267 Mont. 528, 539, 885 P.2d 432, 439. We therefore hold that there is substantial credible evidence in the record to support the jury's verdict that a contract was formed on August 12, 1994, between Jack and General Mills' Joplin elevator for the sale of 20,000 bushels of feed wheat.

¶20. Monica also contends that no substantial evidence was presented at trial to support the jury's verdict that November 2, 1994, was an appropriate date for General Mills to cancel and price out the Joplin contract. In particular, Monica relies upon testimony which indicated General Mills knew of Jack's repudiation of the Joplin contract as early as September 20, 1994, a date when the market price for covering the undelivered goods would have cost five cents less per bushel. It is Monica's contention that General Mills was obligated to price out the Joplin contract at the market price for feed wheat on September 20, 1994, rather than on November 2, 1994.

¶21. Our review of the record reveals that there was substantial credible evidence to support the jury's verdict that November 2, 1994, was a reasonable date upon which to cancel and price out the Joplin contract. Upon being notified that Jack was not going to deliver the grain under the Joplin contract, the manager of the Joplin elevator contacted his superior in the regional office in Great Falls, Montana, who followed up on that information with a written letter to Jack requesting performance under the contract and setting a deadline for cancellation of the contract if performance was not forthcoming. When its deadline was not met, General Mills canceled the contract and priced out its damages at the market price for feed wheat on that day, as it was entitled to do under the terms of its contract.

¶22. Section 30-2-610(a), MCA, specifically authorizes an aggrieved party to a repudiated contract to await the performance of the repudiating party for a commercially reasonable time before deeming the contract breached. The jury found General Mills' actions in urging Jack's performance before canceling the contract to

be commercially reasonable, and we see no reason to disturb this finding on appeal. We therefore affirm the decision of the District Court in denying Monica's motion for judgment as a matter of law.

¶23. Did the District Court err in denying Monica's motion for an award of court costs?

¶24. Monica assigns as her third error on appeal the failure of the District Court to award her court costs as the prevailing party on General Mills' counterclaim. In reviewing a district court's award of costs, our standard of review is whether the district court abused its discretion. *Gilluly v. Miller* (1995), 270 Mont. 272, 274, 891 P.2d 1147, 1148. In its Order on Post-Trial Motions, the District Court declined to award court costs to Monica on the grounds that Monica was not the prevailing party on General Mills' counterclaim. General Mills abandoned its counterclaim at the close of the evidence, and no instructions were given to the jury in relation to the counterclaim. Monica made no objection to the lack of jury instructions on that issue, and the jury's verdict made no reference whatsoever to the allegations in the counterclaim. Based on these considerations, we hold that the District Court did not abuse its discretion in denying Monica's request for court costs.

¶25. For the reasons stated above, we affirm the rulings of the District Court on all issues presented in this appeal.

/S/ J. A. TURNAGE

We concur:

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

/S/ JAMES C. NELSON

No

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART