No. 99-138

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 213

CONAGRA, INC.,

d/b/a PEAVEY COMPANY, a corporation,

Plaintiff and Appellant,

v.

RALPH NIERENBERG and DENNIS NIERENBERG,

Defendants and Respondents.

APPEAL FROM: District Court of the Ninth Judicial District,

In and for the County of Toole,

The Honorable Marc G. Buyske, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

K. Dale Schwanke, Jardine, Stephenson, Blewett & Weaver, Great Falls, Montana

For Respondent:

Robert G. Olson, Frisbee, Moore & Olson, Cut Bank, Montana

Submitted on Briefs: September 23, 1999

Decided: August 10, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 ConAgra, Inc., d/b/a Peavey Company (ConAgra) appeals from a judgment issued by the Ninth Judicial District Court, Toole County, in favor of Ralph and Dennis Nierenberg (Nierenbergs), following a non-jury trial. We reverse.

¶2 ConAgra raises the following issues:

1. Did the District Court err by finding and concluding that Dennis Nierenberg, as an agent for the Nierenbergs, did not admit making a contract to sell wheat to ConAgra?

2. Did the District Court err by concluding that the Nierenbergs did not receive written confirmation of the sale and purchase of their grain within a reasonable time?

3. Did the District Court err by not finding that the Nierenbergs were estopped from claiming the confirmation was not received in a reasonable time and from denying a contract had been made?

4. Is there substantial credible evidence that the Nierenbergs agreed to sell 12,500 bushels of their wheat to ConAgra on April 9, 1996?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 This matter concerns whether an enforceable oral contract bound the respective parties to the purchase and sale of 12,500 bushels of wheat in the spring of 1996. It is undisputed that the Nierenbergs, who operate a wheat farm near Shelby, Montana, were never bound by a written contract bearing one of their signatures. ConAgra, which operates a grain elevator in Shelby and regularly buys and sells grain, brought suit claiming that the oral agreement between the two parties entitled it to recover $14,125 in expectation damages after the Nierenbergs failed to sell their wheat as promised.

¶4 A critical factor in this dispute is the fact that during that spring the price of wheat was

steadily rising on a daily basis by as much as 20 cents per-bushel.

¶5 Following a non-jury trial on September 25, 1998, the District Court entered judgment for the Nierenbergs, on December 10, 1998. The court, in its Findings of Fact and Conclusions of Law, determined that ConAgra had failed to sufficiently establish that an enforceable oral agreement existed between the parties, and thus the Nierenbergs prevailed on their statute of frauds defense.

¶6 The origins of this dispute can be traced to a phone call placed by Dennis Nierenberg (hereinafter Dennis), on April 9, 1996, which was a Tuesday. On that day, Dennis, acting for himself and his father, Ralph Nierenberg, discussed the sale of the Nierenbergs' number-one, dark northern spring wheat with Marcus Raba (Raba), who at the time managed ConAgra's Shelby, Montana, grain elevator.

¶7 According to ConAgra's version of the conversation, the parties agreed that 12,500 bushels of wheat would be sold by the Nierenbergs and purchased by ConAgra for $5.01 a bushel. At that time, Raba filled out a customary order sheet memorializing the terms discussed during the phone call. ConAgra contends that such an oral agreement by phone is routine, as a matter of its own course of dealing with the Nierenbergs and other area farmers, as well as within the trade of grain purchase and sales by other area grain elevators.

¶8 Dennis, on the other hand, maintains that he was doing nothing more than checking the market price that day, and that it was understood that unless he signed a contract no enforceable agreement was reached. He alleges that he has never consummated a grain sale with ConAgra without first signing a written contract. It is undisputed that he requested that a written contract be prepared for his signature, and that Raba followed this instruction. In dispute is whether Dennis requested that the contract be mailed to his residence (which he contends), or whether he stated that he would stop by the elevator at some later time and sign the contract (which ConAgra contends).

¶9 Following the phone call, Raba instructed Eve Jacobson (Jacobson), another ConAgra employee, to prepare what ConAgra characterizes as a written "confirmation" contract based on the order sheet. ConAgra asserts that "Marcus signed it and held it for Dennis to come in and sign." According to ConAgra, when Dennis failed to show up at the elevator and sign the contract within the next few days, Raba "sent the original contract he signed to Dennis's Shelby address on April 17," which was the following Wednesday.

¶10 It is undisputed that Dennis received the confirmation contract on April 19, 1996, a Friday, and that this contract expressly provided the terms discussed on April 9, 1996: 12,500 bushels of wheat at $5.01 per bushel. The contract also provided a time of shipment: April 9, 1996 to May 31, 1996, and provided discount information, which pertains to reductions in the sales price determined by the actual quality of the grain, including protein, moisture content, and "waste." The District Court would find that the parties never discussed such discounts during the phone conversation. Also, the confirmation form provided no printed signature line for the seller, Dennis. Instead, a handwritten line was drawn in above the printed signature line, where Raba had signed. Raba would explain at trial that whether a farmer actually signs and returns such a confirmation contract is a formality that has no bearing on the formation of such an agreement; rather, the farmer's receipt confirms the existing oral agreement. He asserted that such oral contracts account for more than 90 percent of ConAgra's grain purchases.

¶11 After receiving the confirmation contract that day, a Friday, Dennis stopped by the elevator, and discussed lowering the quantity to 10,000 bushels. Dennis maintains that this request resulted from his concern, as well as his father's, that he did not have 12,500 bushels of wheat, which had been stored on their farm since the 1995 harvest. Raba, in turn, explained to Dennis that, essentially, it was too late, that the grain in the Nierenbergs' bins already belonged to ConAgra, that it is common for ConAgra to turn around and sell the grain to another buyer immediately after making such an oral agreement, and that Dennis would be financially liable for any shortages under the contract, which required that the 12,500 bushels be delivered by May 31, 1996. The District Court would find that ConAgra had in fact resold the grain shortly after April 9, 1996.

¶12 Dennis did not assert, at this time, that a contract had not been formed between the parties. The confirmation contract provided that it "will be enforceable in accordance with the exact terms unless you promptly notify us in writing with any objections." Apparently, he and Raba instead discussed the possibility of filling the 12,500 bushel requirement out of the Nierenbergs' 1996 harvest. The parties did not reach an agreement on this. Dennis indicated that he would measure the grain in the Nierenbergs' bins--which he apparently had not done that spring--and also indicated that he would seek a legal clarification concerning the contract confirmation he had received that day. He would later testify that he was unable to reach the grain bins that day due to muddy road conditions. He apparently had no similar difficulty in reaching an attorney.

¶13 Dennis returned later that day, after 4 p.m., and discussed selling 600 bushels in his

daughter's name with Jacobson (Raba had already left for the day). The per-bushel price at that time was $5.60. Dennis instructed Jacobson to mail the contract to his residence. Dennis would later explain that this transaction--which he did not honor, either, and would be found liable for subject to his stipulation at a partial summary judgment hearing--was for the sole purpose of testing how long it would take ConAgra to mail him the contract. The confirmation arrived at his residence a few days later, apparently on the following Monday, according to deposition and trial testimony.

¶14 The Nierenbergs ultimately sold the 12,500 bushels to another grain elevator, Harvest States, for $5.85 per bushel the following Tuesday, April 23, 1996. Believing that he had no obligation to sell wheat to ConAgra--based on the advice of counsel--Dennis did not notify Raba or any other ConAgra agent of his sale to Harvest States. Raba called him some time later, apparently in early or mid-May. Again, Dennis did not indicate that he did not believe he was obligated to perform under an oral agreement. Instead, Dennis "put him off" by telling Raba that he would deliver the wheat "one of these days."

¶15 After independently learning of the Nierenbergs' sale to Harvest States, ConAgra, in a May 24, 1996 letter, advised the Nierenbergs that it would assert its contractual rights, and demand payment of the difference between the contract price ($5.01 per bushel), and the current market price ($6.14 per bushel) it had incurred in purchasing other grain to fulfill its sale obligations pursuant to its purchase of the Nierenbergs' wheat. Thus, ConAgra pursued this matter in order to recoup the $1.13 per-bushel price on 12,500 bushels for a total of $14,125.

¶16 In their Answer, the Nierenbergs denied that the parties entered into a contract, and asserted, as an affirmative defense, the signed-writing requirement under the statute of frauds, pursuant to the Uniform Commercial Code governing sales under § 30-2-201(1), MCA. Thus, any alleged oral contract between the parties was unenforceable, because the sale of goods price exceeded $500, and it is undisputed that Dennis never signed a contract.

¶17 In a March 19, 1998 order granting partial summary judgment, the court determined that Dennis Nierenberg was a "merchant" as a matter of law. The court based its determination on the fact that Dennis had been selling grain crops since 1986 and was familiar with the prices of grain through periodic visits to local grain elevators. Specifically, the court determined:

> [Dennis] generally sells grain pursuant to an initial oral agreement, memorializing

such agreement in a written contract signed when he received payment for the grain sold. He has sold grain to a local elevator on several occasions without a written contract. He is aware the elevator that he sells grain to may resell the grain purchased, but he is not aware of the particulars of those sales.

¶18 This determination was relevant to ConAgra's claim that an exception to the Uniform Commercial Code's statute of frauds governing sales exists for a "merchant" who provides written confirmation to another "merchant" within a "reasonable time," and thus exempts the sales transaction from the signed-writing requirement. ConAgra contends that Dennis's receipt of the confirmation contract on April 19, 1996--ten days after the phone discussion--was within a reasonable time, and pursuant to the statutory exception Dennis never objected to the confirmation within 10 days.

¶19 Following the trial on September 25, 1998, the District Court concluded that Dennis Nierenberg never "admitted" in his pleadings or testimony that a contract for the sale and purchase of his grain was made with ConAgra. This conclusion pertains to another statutory exception to the signed-writing requirement under the statute of frauds asserted by ConAgra. The court concluded that such a judicial admission must be unambiguous, and Dennis's testimony did not include an unambiguous admission to all the necessary elements of a contract under the circumstances.

¶20 Next, the court concluded that, although both parties were merchants, the confirmation received within 10 days by Dennis on April 19, 1996, was not within a reasonable time. This conclusion was reached in light of the "upwardly changing price at the time" of the phone conversation between ConAgra and Dennis. "Considering the fluctuation in price occurring at the time Dennis Nierenberg and Plaintiff had their telephone conversation, and considering that Plaintiff simply had to forward to Dennis Nierenberg a copy of the already prepared memorandum to satisfy Section 30-2-201(2)," the court concluded that ConAgra did not give Dennis Nierenberg written confirmation within a reasonable time.

¶21 The District Court entered a judgment on December 10, 1998, in favor of the Nierenbergs on all "unresolved counts of Plaintiff's complaint," and awarded the Nierenbergs costs. ConAgra appealed.

## STANDARD OF REVIEW

¶22 This Court reviews the findings of a trial court sitting without a jury to determine if the court's findings are clearly erroneous. Rule 52(a), M.R.Civ.P; *Columbia Grain Intern. v. Cereck* (1993), 258 Mont. 414, 417, 852 P.2d 676, 678 (citation omitted). To determine whether a finding is clearly erroneous, this Court uses the following three-part test: (1) the Court will review the record to see if the findings are supported by substantial evidence; (2) if they are supported by substantial evidence, we determine if the trial court has misapprehended the effect of the evidence; and (3) if the findings are supported by substantial evidence and the trial court has not misapprehended the effect of the evidence, the Court may still find that a finding is clearly erroneous although there is evidence to support it, if a review of the record leaves the Court with the definite and firm conviction that a mistake has been made. *Columbia Grain*, 258 Mont. at 417-18, 852 P.2d at 678 (citation omitted). Further, in determining whether the trial court's findings are supported by substantial credible evidence, this Court must view the evidence in the light most favorable to the prevailing party. *See DeNiro v. Gasvoda*, 1999 MT 129, ¶ 9, 294 Mont. 478, ¶ 9, 982 P.2d 1002, ¶ 9 (citations omitted).

¶23 Our standard of review as to conclusions of law, is whether the lower court's determination of law is correct. *Smith v. General Mills, Inc.*, 1998 MT 280, ¶ 11, 291 Mont. 426, ¶ 11, 968 P.2d 723, ¶ 11 (citation omitted).

## DISCUSSION

¶24 This case presents a request for a straightforward, legal determination as to the respective rights of the parties as buyers and sellers of grain in Montana under a number of issues. Although we ultimately conclude that one issue is dispositive, it is necessary that we resolve the apparent uncertainty concerning the U.C.C. statute of frauds governing sales under the fairly common factual scenario set forth here.

¶25 First, we disagree with the Nierenbergs that the dispositive issue in this case is "whether or not the parties made an oral agreement." Rather, more precisely, the dispositive issue is whether the parties formed an *enforceable* oral agreement. Subsection (1) of § 30-2-201, MCA, provides as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more *is not enforceable* by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his

authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(Emphasis added). The Nierenbergs asserted a statute of frauds affirmative defense pursuant to the foregoing.

¶26 Thus, as a starting point, the parties here could have discussed the purchase and sale of grain on April 9, 1996, and Dennis could have offered to sell 12,500 bushels of wheat, and Raba, as an agent of ConAgra, could have accepted. *See Keesun Partners v. Ferdig Oil Co., Inc.* (1991), 249 Mont. 331, 337, 816 P.2d 417, 421 (stating that in order to effectuate a contract there must be not only a valid offer by one party, but also an unconditional acceptance, according to its terms, by the other). Both parties could have even concluded the phone call with such language as "fine and dandy, you have a deal." *See A.T. Clemens & Son v. Reber Plumbing & Heating Co.* (1961), 139 Mont. 115, 120, 360 P.2d 1005, 1008 (affirming judgment that subcontract for ventilation system installation became binding at the time it was orally made). Under § 30-2-201(1), MCA, however, such an oral contract simply is not enforceable unless it is reduced to writing and signed by the party against whom enforcement is sought.

¶27 The U.C.C. statute of frauds, however, provides alternatives, or exceptions, to the signed writing requirement of § 30-2-201(1), MCA, which effectively prevent a party from asserting the affirmative defense. Under § 30-2-201(3)(b), MCA, for example, if a party admits that an oral contract for sale was made by way of his pleadings, testimony, or "otherwise in court," then he can no longer assert a statute of frauds defense. Alternatively, under § 30-2-201(2), MCA, if both parties are "merchants," one party may send written confirmation of an oral contract to the other which, if received within a "reasonable time," provides that the receiving party has 10 days to object in writing. Should the receiving party subsequently fail to object as required, he too can no longer assert a statute of frauds defense. *See* U.C.C. § 2-201, Official Comment 3 (stating that "failure to answer a written confirmation of a contract within ten days of receipt is tantamount to a writing under subsection (2) and is sufficient against both parties under subsection (1)"; *Shpilberg v. Merrill Lynch* (Ky. 1976), 535 S.W.2d 227, 229 (concluding that the party who has received the writing and not objected to it is in the same legal position, as concerns enforceability, as the party who signed and sent the writing).

¶28 In light of the fact that much of the foregoing turns on the question of formation, it is

imperative to our discussion that we recognize that the U.C.C. rules governing sales agreements are far more permissive in this respect than the general common law rules governing contract formation. *See, e.g.,* §§ 28-2-102, 301, and 303, MCA (providing that all contracts require that the parties consent, that the consent be mutual, and that they agree upon the same thing in the same sense). Under § 30-2-204(3), MCA, for example, even though "one or more terms are left open" a sales contract does not fail for indefiniteness "if the parties have *intended* to make a contract and there is a reasonably certain basis for giving an appropriate remedy." (Emphasis added). Subsection (1), under § 30-2-204, MCA, provides that a "contract for sale of goods may be made in *any manner sufficient to show agreement*, including conduct by both parties which recognizes the existence of such a contract." (Emphasis added). Subsection (2), under § 30-2-204, MCA, provides that an agreement "sufficient to constitute a contract for sale may be found *even though the moment of its making is undetermined*." (Emphasis added). Accordingly, a sales contract can be formed even though there is no agreement on the price, § 30-2-305, MCA, on the delivery terms, §§ 30-2-307, 308 and 309, MCA, and when payment is due, § 30-2-310, MCA. The only term that a sales contract must include, generally, is quantity. *See* U.C.C. § 2-201, Official Comment 1 (stating that the "only term which must appear in writing is the quantity term"). Even this rule is tempered by § 30-2-306, MCA, which permits indefinite quantities in a "requirements contract."

¶29 Accordingly, we must expel certain unnecessary chaff from the parties' arguments regarding the terms of the alleged contract here, namely the Nierenbergs' contention that there was no "meeting of the minds" as to all material terms of the contract. As the foregoing indicates, the parties obviously reached accord on the quantity of the grain, namely 12,500 bushels, as well as the price at $5.01 per bushel, sufficient for a U.C.C. sales contract to be formed. Therefore, as a preliminary matter, we hold that the District Court, in determining that Dennis did not admit that a contract was formed because he did not unambiguously testify to the "necessary elements of a contract" is incorrect. That the parties did not discuss, according to the court's findings, the "reduction in per bushel price . . . due to variance in protein, moisture content, or waste in the grain" is wholly immaterial under these facts in determining whether an enforceable sales contract was formed.

¶30 Far more critical to our discussion here is whether there is substantial evidence that Dennis's statements and conduct at the time indicates he was contractually bound as of April 9, 1996, pursuant to his discussion of contract terms with Raba, or whether the evidence instead reveals the statements and conduct of a person who would not be bound

until the oral "discussion" or "contract" was reduced to writing and signed at a later time.

¶31 Generally, it is the duty of the court to enforce a contract if the parties intended that one exist. *See Nordwick v. Berg* (1986), 223 Mont. 337, 342, 725 P.2d 1195, 1199 (citations omitted); § 28-3-201, MCA. Such intent, in turn, "must be gathered from the outward objective manifestations of the parties and not by the subjective undisclosed intent of one of the parties." *Miller v. Walter* (1974), 165 Mont. 221, 226, 527 P.2d 240, 243 (citations omitted). *See also* § 28-3-301, MCA (providing that a contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful). And, accordingly, such evidence in this instance must be viewed in the light most favorable to the Nierenbergs. *DeNiro*, ¶ 9.

¶32 With these general prefatory rules and principles in place, we turn to the issues raised.

## *Issue 1.*

*Did the District Court err by finding and concluding that Dennis Nierenberg, as an agent for the Nierenbergs, did not admit making a contract to sell wheat to ConAgra?*

¶33 The District Court concluded that Dennis Nierenberg did not admit in his pleadings or testimony that a contract for the sale and purchase of his grain was made with ConAgra, and thus the Nierenbergs could rely on their statute of frauds defense. As indicated, the District Court incorrectly reached its legal determination by narrowly focussing on whether the parties discussed certain terms that the court deemed material. However, we may nevertheless affirm a district court decision which is correct regardless of the district court's reasoning in reaching its decision. *See Clark v. Eagle Systems, Inc.* (1996), 279 Mont. 279, 287-88, 927 P.2d 995, 1000 (affirming summary judgment on tortious interference and emotional distress). We conclude that the District Court correctly determined that Dennis's "admissions" were ambiguous, and therefore ConAgra's reliance on § 30-2-201(3)(b), MCA, must fail.

¶34 On appeal, ConAgra points to numerous passages from Dennis's trial testimony that, once pieced together, allegedly show he intended to make a sales contract with ConAgra by phone on April 9, 1996, and therefore contends that the District Court erred in reaching its findings and conclusions. For example:

Q: Well, actually you ended up selling more than 10,000 didn't you? You sold

12,500.

A: Yeah, the discussion was it got to the point where I'd talked to him about 12,500.

\*\*\*

Q: And when you spoke with Marcus and talked to him about selling that grain, that was over the phone, correct?

A: Yeah, it was to verify the price and tell him to send me a contract.

\*\*\*

Q: And, in fact, you were selling the 12,500 bushels because--because the price was so good, I take it?

A: Well, we needed to unload most of that stuff and get going for the next year.

\*\*\*

Q: Well, you would have had to tell the person how many bushels you were selling, I take it, for them to at least make up the amount of bushels in the contract; correct?

A: That's correct.

\*\*\*

Q: Now when you went in to talk with Marcus [on the 19th], what was your reason to go in and see him? It was because you were concerned about the number of bushels you sold him, wasn't it?

A: That's correct.

Q: And when you spoke with him, did you speak with him about what might occur if you couldn't deliver the 12,500 bushels?

A: Well, yeah, I wanted him to reduce that contract to at least 10,000 bushels, until I knew what I had exactly out there, and then, you know, we'd bring the rest in to the

elevator.

¶35 Section 30-2-201(3)(b), MCA, provides: "A contract which does not satisfy the [signed-writing] requirements of subsection (1) but which is valid in other respects is enforceable . . . . if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made . . . ." As one court has stated, this particular exception under the U.C.C. emphasizes the evidentiary purpose of the statute of frauds. *See Siam Numhong Prod. Co., Ltd. v. Eastimpex* (N.D.Cal. 1994), 866 F.Supp. 445, 450. Therefore, whether such an admission was made is a question of law, and this Court reviews issues of law to determine whether the lower court's application or interpretation of the law is correct. *See Larson v. Green Tree Financial Corp.*, 1999 MT 157, ¶ 17, 295 Mont. 110, ¶ 17, 983 P.2d 357, ¶ 17.

¶36 In crafting a rule to apply to the facts here, the District Court closely followed two Utah state court decisions, which provide that the "testimony forming the basis from which the court may conclude a contract existed should be unambiguous" and that "fairness requires that the defendant's position be ascertained from the total posture of his defense," rather than taking a hypothetical statement from his testimony and treating it as a statement of fact. *See Rinderknecht v. Luck* (Utah Ct.App. 1998), 965 P.2d 564, 566; *Lish v. Compton* (Utah 1976) 547 P.2d 223, 226.

¶37 Our review of case law from various jurisdictions indicates that the Utah courts follow a fairly strict approach, meaning that although objective testimony indicates that an offer and acceptance have occurred, the "admission" must nevertheless be unequivocal, with no subsequent conditional statements that modify or explain the "admission." *See Rinderknecht*, 965 P.2d at 566 (determining that the use of the term "contract price" in a party's pleadings in reference to a telephone negotiation for the sale of cattle did not provide a clear and unambiguous admission of a contract); *United Acquisition Corp. v. Banque Paribas* (S.D.N.Y. 1985), 631 F.Supp. 797, 810 (requiring that a judicial admission of the existence of a contract must be clear and unequivocal to take the contract out of the statute of frauds); *Thomas v. Prewitt* (Miss. 1978), 355 So.2d 657, 661 (concluding that seller "admitted" that an agreement was reached, but his testimony also indicated that the agreement was "conditional"); *Oakley v. Little* (N.C.Ct.App. 1980), 272 S.E.2d 370, 374 (concluding that although price and quantity were discussed, testimony of defendant indicated that alleged agreement was "tentative" or "incomplete").

¶38 The District Court also cited *Quaney v. Tobyne* (Kan. 1984), 689 P.2d 844, for the

somewhat contrary proposition that a "party need not specifically admit the existence of a contract to come within the exception to the statue of frauds." *Quaney* is one of the lead cases often cited for the less-stringent "contract-by-inference" approach to admissions, which, in recognition of the underlying policy of formation found in the U.C.C. (see above Discussion), disregards conflicting testimony once a party admits to statements or conduct from which a reasonable inference can be drawn that an actual bargain was struck. After synthesizing extensive case law and various authorities, the *Quaney* court set forth the following principle of law:

> [T]he exception to the statute of frauds contained in K.S.A. 84-2-201(3)(b) is satisfied when the party who has denied the existence of an oral contract in reliance on the statute takes the stand and, without admitting explicitly that a contract was made, testifies as to his statements or his actions which establish the terms of the oral contract claimed by the opposing party. It is not necessary that there be an express declaration in which the party admits the making of the oral contract. It is sufficient if his words or admitted conduct reasonably lead to that conclusion.

*Quaney*, 689 P.2d at 851. *See also Nebraska Builder Prod. Co. v. Industrial Erectors, Inc. (Neb. 1992), 478 N.W.2d 257, 268 (stating that a "compelled or involuntary admission of the existence of an oral contract, obtained during cross-examination at trial, may be relied upon to satisfy § 2-201(3)(b)"); Packwood Elevator Co. v. Heisdorffer (Iowa 1977), 260 N.W.2d 543, 546 (suggesting that admission need only describe conduct or circumstances from which the trier of fact can infer that a contract was made) (citations omitted).*

¶39 Obviously, it is important that a court determine, with precision, what counts as an "admission" under this statute given the reality that in such cases an admission inevitably must be extrapolated from the statements of a party who is denying that a contract was ever formed. Equally obvious is the notion that if the "admission" reflects only that the parties were still in negotiation, or that an agreement was reached but it was conditional, it is insufficient. *See, e.g., In Re Flying W Airways, Inc.* (E.D.Pa. 1972), 341 F.Supp. 26, 67-68; *Thomas*, 355 So.2d at 661. On the other hand, a court's task is simple when a party flatly states that an oral agreement was made.

¶40 Such simplicity was precisely the circumstances faced by this Court in a decision not relied on by the District Court here. In *Farmers Elevator Co. of Reserve v. Anderson* (1976), 170 Mont. 175, 552 P.2d 63, we observed that the so-called "judicial admission" exception to the statute of frauds "prevents a litigant from simultaneously admitting the existence of a contract and claiming the benefits of the statute." *Farmers Elevator*, 170

Mont. at 179, 552 P.2d at 65. In contrast to the facts here, we noted in *Farmers Elevator* that the party against whom this exception applied "at no time denied the existence of the contract, the quantity contracted for, or the stipulated price." *Farmers Elevator*, 170 Mont. at 177, 552 P.2d at 64. We observed that at trial, the party, Anderson, testified:

Q: So your testimony is that there was an agreement for you to sell eighteen thousand bushels of durum?

A: Yes.

Q: And that agreement was made in October, October 28th, of 1972, is that correct?

A: Yes.

*Farmers Elevator, 170 Mont. at 179, 552 P.2d at 65. We concluded that the oral contract was therefore not rendered unenforceable by the statute of frauds, pursuant to § 30-2-201(3)(b), MCA. Farmers Elevator, 170 Mont. at 179, 552 P.2d at 65.*

¶41 This Court has not revisited this particular exception in a subsequent holding, nor have we provided any further analysis beyond that found in *Farmers Elevator*, which presents a much clearer, undisputed "admission" than the alleged admission here. Understandably, the parties below relied on U.C.C. case law from other states, which in turn informed the court's ultimate conclusion on this issue.

¶42 This Court has, however, dealt at length with "judicial admissions" in other contexts, and we conclude that the prevailing principles for such admissions control the admissions exception under § 30-2-201(3)(b), MCA, and must therefore form the lens through which non-Montana case law must be viewed. As § 30-1-103, MCA, indicates, unless displaced by the particular provisions of the U.C.C., other principles of law and equity "shall supplement its provisions."

¶43 In Montana, generally, whether a statement is a judicial admission depends upon the circumstances of each case. *Kohne v. Yost* (1991), 250 Mont. 109, 113, 818 P.2d 360, 362. However, in *Rasmussen v. Heebs Food Center* (1995), 270 Mont. 492, 497, 893 P.2d 337, 340, we described a "judicial admission" as "an *express waiver* made in court by a party or his attorney conceding the truth of an alleged fact" (emphasis added). We have also stated that "it has a conclusive effect upon the party who makes the admission" and no further evidence can be introduced to prove, disprove, or contradict the admitted fact. *Kohne*, 250

Mont. at 112, 818 P.2d at 362 (citing 9 Wigmore on Evidence, §§ 2588, 2590 (Chadbourn rev. 1981)). For a judicial admission to be binding upon a party, therefore, the admission must be "an *unequivocal* statement of fact" rather than a conclusion of law or the expression of an opinion. *DeMars v. Carlstrom* (1997), 285 Mont. 334, 337-38, 948 P.2d 246, 248-49 (concluding that party's testimony that a car accident was "all her fault" was either a legal conclusion or an expression of her personal opinion, and therefore not a statement of fact) (citations omitted and emphasis added). The policy underlying the "unequivocal" standard is readily apparent: because of the likely finality which results from the application of this doctrine, as discussed in *Kohne*, it must be applied with caution and a degree of skepticism. *See A.T. Klemens & Son v. Reber Plumbing & Heating Co.* (1961), 139 Mont. 115, 360 P.2d 1005 (addressing evidentiary issue of witness's contradictory statements).

¶44 In *Klemens*, a non-U.C.C. case determining whether or not a contract was formed at the time it was orally made, we adopted several evidentiary principles as set forth in *Wigmore on Evidence* that should guide a court's review of testimony in determining whether a judicial admission has been made. We quoted the following from *Wigmore*:

> Testimony in court is an elusive matter of mental operations. It is the culmination of much talk and reflection and memory-stirring between all concerned. It is full of surprises at the trial. The truth of the case depends on a comparison of what all the witnesses say and all the circumstances indicate. A rule which binds a party to a particular statement uttered on the stand becomes an artificial rule. It is out of place in dealing with testimony.

*Klemens, 139 Mont. at 123-24, 360 P.2d at 1009-10 (quoting 9 Wigmore on Evidence, § 2594(a) at 601 (3d ed. 1940)). Thus, we observed that:*

> We can visualize many situations where a party may be the only witness who can testify as to certain facts supporting his claim or defense. Many times counsel, in aggressive cross-examination, can elicit answers from parties which are inconsistent with their claim or defense. This is especially true where a party is a layman and not familiar with the niceties of legal terminology. It would seem grossly unjust if one or two answers on cross-examination, given because of mistake or confusion, could defeat a party's claim or defense where the party testified otherwise on both direct and redirect examination.

*Klemens, 139 Mont. at 123, 360 P.2d at 1009. We concluded that although the Plaintiff offered*

*conflicting testimony under cross examination, the parties intended to be bound at the time the oral agreement was made, rather than at a later date when it was reduced to writing. Klemens, 139 Mont. at 124, 360 P.2d at 1010.*

¶45 In this sense, prodding a party while on the witness stand or while testifying during a deposition to say certain magical legal words that may indicate a contract was formed must be viewed with disfavor. Thus, in accordance with Montana law, determining whether a party has admitted that a contract for sale was made sufficient to remove an oral contract from the signed-writing requirements of § 30-2-201(1), MCA, may be guided by those courts that have followed a "deliberate, clear and unequivocal" standard. *See Thomas*, 355 So.2d at 661. The court in *Thomas* followed an often-cited Texas decision which set forth the following five-part rule for testing the sufficiency of a claimed judicial admission:

> (1) that the declaration relied upon was made during the course of a judicial proceeding, (2) that the statement is contrary to an essential fact embraced in the theory of recovery or defense asserted by the person giving the testimony, (3) that the statement was deliberate, clear and unequivocal, (4) that giving of conclusive effect to the declaration will be consistent with public policy, and (5) the testimony must be such as relates to a fact upon which a judgment for the opposing party may be based.

*Griffin v. Superior Insurance Company (Tex. 1960), 338 S.W.2d 415, 419. The Griffin court also provided that a judicial admission was not effective if it was "subsequently modified or explained so as to show that [the litigant] was mistaken." Griffin, 338 S.W.2d at 418 (quoting Stansolind Oil & Gas Co. v. State (Tex. 1940), 145 S.W.2d 569, 570). We conclude that the foregoing standard comports with our own judicial admission doctrine, and provides a clear approach for making such a determination.*

¶46 Thus, under the particular circumstances of this case, we must determine whether Dennis deliberately, clearly, and unequivocally made a statement or statements of fact-- and not legal conclusions or opinions--indicating that he unconditionally made an oral contract with ConAgra by phone on April 9, 1996, for the sale of 12,500 bushels of wheat. In turn, our review of such statements must adhere to the "outward objective manifestations" test, as expressed in *Miller*, and must be viewed in a light favorable to the Nierenbergs.

¶47 Here, Dennis clearly testified to the fact that he placed the call to ConAgra on April 9, 1996, with the intent to sell his grain, and that he and Raba discussed the terms of such a

sale. He effectively admitted the fact that he offered to sell 12,500 bushels of wheat, and that ConAgra, through its agent, Raba, agreed to pay him $5.01 per bushel for the wheat.

¶48 Yet, his testimony was not necessarily "deliberate" as was the case in *Farmers Elevator*; rather, Dennis was responding to carefully worded questions posed by opposing counsel, including numerous references to the "contract." Such responses, in turn, served to weave together a legal conclusion that Dennis in fact sold the grain, rather than engaged in preliminary negotiations demonstrating a mere willingness to sell.

¶49 Further, Dennis also testified to the fact that after discussing the terms of the sale, he instructed Raba to write up a contract for his signature. Disregarding (as we must) his opinion, or subjective undisclosed intent, that the discussion was not a "binding contract of any kind," or that "to me it was a preliminary discussion about the price of the grain," he also testified to the fact that he *always* signed a contract when selling grain to ConAgra, which comports with an essential fact embraced by his defense: that a signed writing is required for the sale of grain, and that no oral agreement was binding until it was reduced to writing and signed by him. In this sense, he did not definitively testify to the fact that his ordinary dealings with ConAgra--or other grain elevators for that matter--usually or always involved oral contracts *not* requiring a signed writing by him. As the District Court's findings bear out, his testimony indicates that, in fact, most all of the Nierenbergs' grain sales involved Dennis signing a contract shortly after oral discussion with the elevator. Thus, Dennis's own testimony served to explain the fact that even if an oral sales agreement was made by phone on April 9, 1996, the parties agreed that a contract would be drafted which Dennis would later sign. Accordingly, such an apparent contradiction to an outright admission that he was orally bound to sell grain on April 9, 1996, must be viewed in his favor.

¶50 Finally, Dennis provided several statements of fact regarding his conduct following the phone call, which ConAgra suggests are inferentially those of a person who is bound by an agreement. Primarily, ConAgra looks to the fact provided in Dennis's testimony that once he received the confirmation contract, and visited the elevator, he did not inform Raba, on April 19, 1996, that a contract had not been formed. Yet, the fact that Dennis was willing to further negotiate the quantity--10,000 bushels rather than the discussed 12,500 bushels--is not necessarily the objective conduct of person who is contractually bound without a signed writing. Dennis also testified to the fact that Raba had to explain to him that he was contractually obligated pursuant to their earlier phone conversation, as well as other fundamentals of how the grain elevator conducted its business. He testified that he

then left the elevator that day planning to seek legal counsel concerning this new uncertainty regarding his unsigned confirmation contract. On the whole, the testimonial facts provided by Dennis concerning his post-phone conversation conduct are, as the District Court concluded, ambiguous.

¶51 We therefore hold that, pursuant to § 30-2-201(3)(b), MCA, Dennis did not deliberately, clearly, and unequivocally admit in his testimony that a contract for sale was made by phone with ConAgra on April 9, 1996. Accordingly, we hold that the decision of the District Court, that Dennis Nierenberg did not "admit in his pleadings or testimony that a contract for the sale and purchase of his grain was made with Plaintiff" is affirmed.

¶52 In reaching this conclusion, however, we emphasize that in no sense is this issue dispositive of whether in fact an enforceable contract was made between the parties on April 9, 1996. The foregoing issue addresses only an evidentiary question which, in Montana, requires that parties such as ConAgra must carry a heavy burden. The ultimate determination regarding enforceability is the subject of the next issue.

## *Issue 2.*

*Did the District Court err by concluding that the Nierenbergs did not receive written confirmation of the sale and purchase of their grain within a reasonable time?*

¶53 In relying on a 1976 Utah court decision, the District Court concluded that a written confirmation sent by ConAgra following the April 9, 1996 telephone discussion at issue was not received by Dennis Nierenberg within a "reasonable time," and therefore could not bar the Nierenbergs' statute of frauds defense. The court determined that receipt of the confirmation in this instance within 10 days was unreasonable.

¶54 The court's conclusion under this issue was premised on the court's earlier determination that Dennis Nierenberg was a "merchant" as defined under § 30-2-104, MCA, and related case law. Although farmers are not merchants as a matter of law in Montana (*see Smith v. General Mills, Inc.*, 1998 MT 280, ¶ 13, 291 Mont. 426, ¶ 13, 968 P.2d 723, ¶ 13), whether Dennis is a merchant was not cross-appealed by the Nierenbergs, and is therefore not at issue.

¶55 Section 30-2-201(2), MCA, states:

Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

The foregoing "merchant" exception to § 30-2-201(1), MCA's writing requirement is one born from the coupling of custom and efficiency in the market place. Wheat, for example, must pass through numerous sales transactions on its journey from field to bakery, a process that simply does not permit the time-consuming enterprise of carefully drafted and executed written agreements stating all material terms. In theory, it is essential to the wheat farmer merchant, as well as to the merchant-buyer, that prices can be contractually fixed orally, by phone, given the constraints of both time and physical proximity. Subsection (2) assumes, therefore, that no written contract is necessary between two seasoned merchants because they prefer to transact business via a telephonic handshake. *See generally* 1 Hawkland U.C.C. Series § 2-201:5 (1998). The "merchant exception" simply facilitates this desirable method of conducting business by encouraging the sending of writings to confirm oral contracts. Accordingly, under § 30-1-204(2), MCA, the determination of what constitutes a "reasonable time" under any given specific set of facts "depends on the nature, purpose and circumstances of such action." This determination is a question of fact that must be resolved in the light of the circumstances surrounding the particular transaction. *See Hawkland*, § 2-201:5.

¶56 As a preliminary matter, we observe that the District Court found and concluded that had Dennis accepted the confirmation "document," he would have been bound to its terms, indicating that the confirmation contract was enforceable once signed. The court concluded, therefore, that if the confirmation was received within a reasonable time, "the writing necessary to comply with § 30-2-201(1), MCA, is present." Further, the court, in issuing partial summary judgment in favor of ConAgra, concluded that Dennis generally sold grain "pursuant to an initial oral agreement, memorializing such agreement in a written contract signed when he received payment for the grain sold."

¶57 We conclude that, in view of the substantial evidence as a whole--notwithstanding Dennis's adamant denial which was the subject of the first issue--the court correctly reached its determinations in this regard. We also observe that, under U.C.C. § 2-201, Official Comments 3, "failure to answer a written confirmation of a contract within ten days of receipt is tantamount to a writing under subsection (2) and is sufficient against

both parties under subsection (1)." Here, it is undisputed that Dennis never objected in writing to the written confirmation he received within 10 days. Further, Dennis has not once objected to any of the terms found within the signed confirmation contract. Quantity, price, time of delivery, date of formation all accord with Dennis's recollection of his discussion with Raba. His only contention is that "discounts" were not discussed--not that the discounts were unreasonable or inaccurate.

¶58 Therefore, based on the District Court's findings and conclusion, as well as the foregoing Comment, should we conclude that the confirmation was received within a reasonable time, we need not address issue four: whether "there is substantial credible evidence that the Nierenbergs agreed to sell 12,500 bushels of their wheat to ConAgra on April 9, 1996." Without the protection of the statute of frauds, the Nierenbergs, pursuant to the District Court's findings and conclusions, are contractually bound. Thus, we conclude that the confirmation contract, if received within a reasonable time, is sufficient to indicate that a contract for sale was made.

¶59 Pursuant to this preliminary conclusion, we acknowledge that the Nierenbergs' reliance on a statute of frauds defense under § 30-2-201(1), MCA, ordinarily would be waived, as a matter of law, due to the fact there is no evidence that as the receiving party the Nierenbergs ever objected in writing within 10 days of receiving the confirmation from ConAgra. *See generally Cargill Inc. v. Wilson* (1975), 166 Mont. 346, 350-51, 532 P.2d 988, 990 (determining that "a few days" was a reasonable time for receipt requirement and seller-farmer did not object within ten days). *But see Kimball County Grain Coop. v. Yung* (Neb. 1978), 263 N.W.2d 818, 819-21 (affirming judgment of district court that notice received within six months was unreasonable, although defendant-farmer failed to object to its contents in writing within 10 days); *Perdue Farms, Inc. v. Motts, Inc. of Mississippi* (N.D.Miss. 1978), 459 F.Supp. 7, 13 (stating merchant must meet prerequisites of § 2-201(2) in order for confirmatory writing to satisfy the statute of frauds).

¶60 We conclude that the approach taken by the *Yung* and the *Perdue Farms* courts follows the letter and spirit of this particular U.C.C. provision, namely that a merchant who wishes to send confirmation must comply with all of the prerequisites of § 30-2-201 (2), MCA, before the 10-day duty to object in writing may be imposed upon the receiving merchant. Thus, we proceed to the focal issue of whether the confirmation here was received within a reasonable time.

¶61 Once again, this Court is faced with little authority from its own case law upon which a rule, let alone a conclusion, can be drawn. As indicated, we determined that "a few days" was a reasonable time in which a similar confirmation contract for the sale of an agricultural product could be received under subsection (2). *Cargill*, 166 Mont. at 350-51, 532 P.2d at 990.

¶62 Notwithstanding the lack of binding authority, the District Court's reliance on *Lish v. Compton* (Utah 1976), 547 P.2d 223--the facts of which are remarkably similar to those here--is not the firm ground upon which precedent should be built. We know of no other authority that restricts the sender's "reasonable time" to such an extent. *See Cargill, Inc. v. Stafford* (10th Cir. 1977), 553 F.2d 1222, 1224 (holding that twenty-five days was an unreasonable delay for receipt of confirmation for grain purchase); *Bureau Service Co. v. King* (Ill.App.Ct. 1999), 721 N.E.2d 159, 161-63 (determining that delay of eight months in sending confirmatory memoranda of oral grain sale was unreasonable, and acknowledging trade practice of sending such memoranda "within four to seven days").

¶63 In determining that 12 days was not a "reasonable time" in which a grain seller could receive confirmation from a grain buyer of an oral agreement, the Utah court was far less concerned with applying the law to the facts of that case than judicially manufacturing a remedy for an aggrieved--but hypothetical--wheat farmer. The Utah court reasoned that it was unfair to allow a grain buyer to "play the market" prior to sending written confirmation should the price in grain suddenly drop (which was not the case) and thereby availing itself of the opportunity to *not* send confirmation all--all at the expense of the wheat farmer who, remediless, must sell his grain not at the contract price, but instead at what the market will bear. *See Lish*, 547 P.2d at 226-27 (stating that the defendant farmer did not have "the proverbial 'scratch of the pen' to bind the plaintiff if the price had fallen").

¶64 This is a poorly reasoned proposition in light of the clear edicts of the U.C.C. statute of frauds merchant exception, which allow the recipient merchant, in turn, 10 days in which to object, i.e. "play the market" himself. Further, the merchant exception does not dictate which party--buyer or seller--must send the written confirmation. All that § 30-2-201(2), MCA, requires is that one of the parties, in order to create an enforceable oral contract and avoid the signed-writing requirement under § 30-2-201(1), MCA, send written confirmation of the agreement to the other party in compliance with subsection (2). *See generally* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 2-5 (4th ed. 1995). Thus, the farmer as well as the buyer in this instance may lock in an oral

contract price, as the market fluctuates up or down, and therefore both equally possess the proverbial "scratch of the pen" to bind the other party.

¶65 Due to the case-by-case analysis required under this issue, we cannot establish a bright line rule for what is a reasonable time as between a merchant-farmer and merchant-buyer of grain. Nevertheless, we hold that it makes little sense to shorten what is "reasonable" under these circumstances to a term shorter than that offered the recipient, which is precisely what the District Court achieved in determining that 10 days was unreasonable.

¶66 Although a court must look at the broad "nature, purpose and circumstances" in determining whether written confirmation was received within a reasonable time, two specific factors may be examined: (1) the merchant's usual practice or policy for such transactions, and (2) the merchant's excuse for not following its practice or policy. *See generally* Charles D. Onofry, *The Merchant's Exception to the Uniform Commercial Code's Statute of Frauds*, 32 Vill.L.Rev. 133, 152-55 (1987) (discussing *Kimball County Grain Coop. v. Yung* (Neb. 1978), 263 N.W.2d 818 and *Lish v. Compton* (Utah 1976), 547 P.2d 223).

¶67 Here, ConAgra's "usual" practice was to either hold the confirmation contract until the farmer came in, or mail it to the farmer, depending on the farmer's preference. No definite time period was offered into evidence or otherwise established in this respect. During the underlying summary judgment action, the Nierenbergs did, however, concede that confirmation of Dennis's 600 bushel sale to ConAgra received within a "few days"-- apparently three--was within a reasonable time. In their brief, the Nierenbergs further suggest that it would be reasonable for the grain elevator to mail confirmation to the farmer "within a day or two of the telephone conversation." If requested to mail the confirmation, and assuming (for our purposes here) that this could reasonably be accomplished "within a day or two," the farmer would thus receive it within three or four days of making the oral agreement. ConAgra's excuse for what amounts to a six, rather than two-day, delay (including a Sunday) in mailing the confirmation is that in the past Dennis had come to the elevator to sign the confirmation, and due to a misunderstanding, acted upon the belief that this same course would be followed. This misunderstanding, in fact, appears in the District Court's contradictory findings which state that Dennis informed Raba "he would visit the elevator offices to sign the contract" and nevertheless found that ConAgra "did not immediately mail such document to Nierenberg." The evidence shows that ConAgra waited for approximately six days for Dennis's arrival, and

then mailed the confirmation to his address.

¶68 Under these facts, assuming but not deciding that it would be reasonable for ConAgra to mail the confirmation within one or two working days, the slight delay in Dennis's receipt of the confirmation due to an apparent misunderstanding would not be an unreasonable deviation from ConAgra's usual practice under the circumstances. We thus hold that the District Court did not rely on the substantial evidence of this case in determining that Dennis did not receive confirmation of the oral contract within a reasonable time, but instead relied on authority that we conclude is not persuasive on this issue.

¶69 In light of this holding, we observe that the current system employed by ConAgra to buy grain by phone, and then recover expectancy damages should a grain farmer fail to honor an oral contract, encourages rather discourages a breach in circumstances not all that different than those described by the parties herein. *See* § 30-2-712 (2), MCA (describing cover damages); *Columbia Grain Int'l v. Cereck* (1993), 258 Mont. 414, 852 P.2d 676 (awarding difference between the contract bushel price of $4.05 and the replacement price of $4.68 on oral agreement to sell grain). And such a breach is not necessarily a *bad* thing; to the contrary, courts as well as scholars have for more than two decades heralded such an "efficient breach" as an essential free-market tool that maximizes net economic gain.

¶70 This Court has often stated that each party to a contract has a justified expectation that the other will act in a reasonable manner and not outside of "accepted commercial practices" in not only its performance of a contract but in its "efficient breach" as well. *See*, *e.g.*, *Story v. City of Bozeman* (1990), 242 Mont. 436, 450, 791 P.2d 767, 775. *See also Grynberg v. Citation Oil & Gas Corp.* (S.D. 1997), 573 N.W.2d 493, 500 (stating that "our free market system allows economically efficient breaches of contract, for example, when it costs less for one party to breach an unwise contract and to pay the other party compensatory damages than it would cost to completely perform the contract"); *Northern Indiana Public Service Co. v. Carbon County Coal Co.* (7th Cir. 1986), 799 F.2d 265, 279 (Posner, J.) (concluding specific performance was unjustified where an efficient breach brought "to a halt a production process that was no longer cost-justified"); Charles J. Goetz & Robert E. Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach*, 77 Col. L.Rev. 555, 558-59 (1977).

¶71 Under the foregoing rationale, and slightly altering the facts here for the purpose of illustration, Dennis Nierenberg would have been justified, and in fact should be commended, if in fact he chose to dishonor a contract with ConAgra, where grain prices were moving steadily upward. In other words, if he had breached his $5.01 contract when the market reached $5.60 on the day he received the confirmation, April 19, 1996--which would have fixed ConAgra's expectancy damages at fifty-nine cents per bushel--and then proceeded with his sale to Harvest States at $5.85 per bushel on April 23, 1996, he would have increased his net-per-bushel sale price by fifteen cents, or by $1,875.

¶72 Accordingly, Dennis could have simply paid ConAgra its cover costs and then realized his gain. ConAgra would have been compensated for its contract damages, and no legal recourse would have been necessary by either party. Such conduct should be expected of a party that has legally attained the status of "merchant,"an issue that is--needless to say--not before this Court as this time. Contrary to the District Court's underlying reasoning, as evidenced by its reliance on a similar, poorly-reasoned Utah state court decision, "playing the market" is precisely what both parties in this instance do--and are *supposed* to do--so long as they play within the rules. *See Lish*, 547 P.2d at 226-27 (ruling as a matter of law that 12 days was an unreasonable time for defendant to receive contract confirmation).

¶73 Unfortunately, Dennis Nierenberg chose to simply not honor his contractual obligation without notifying ConAgra of his true intentions. His mistake, therefore, was to not give ConAgra prompt notice of his breach so that his obligation for expectancy damages would be fixed; i.e., he acted outside of "accepted commercial practices." It is apparent that Dennis established his dubious position on the advice of legal counsel--meaning, had he received advice to the contrary, he may have indeed chosen a much different course of action. The testimonial record shows that after receiving this advice--at the latest, on the same day he sold the grain to Harvest States--he gave his obligation to ConAgra not a second thought, and that he was in fact deceptive about his sale to Harvest States when Raba called some time in May to determine when the grain would be delivered. Such a breach cannot, and should not, be excused or encouraged under any theory, due to the nature of the market place in which the Nierenbergs have chosen to make their living.

¶74 In this instance, the "Confirmation of Grain Purchase Contract," which the District Court determined would have contractually bound the Nierenbergs had Dennis accepted it, expressly provided that "unless you promptly notify us in writing with any objections" the

confirmation would become enforceable. Thus, as a "merchant," Dennis simply failed to follow the ordinary course of business practices employed by the market in which he sold grain.

¶75 As this issue is dispositive, we need not address issue three pertaining to ConAgra's estoppel argument. Accordingly, the conclusion by the District Court that the agreement between the Nierenbergs and ConAgra cannot be enforced is reversed and this matter is remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., did not participate in the foregoing decision.