SEATON RANCH CO., Respondent, *v.* MONTANA VEGE-
TABLE OIL & FEED CO., Appellant.

No. 8871.

Submitted September 27, 1949. Decided January 19, 1950.

Rehearing denied May 2, 1950.

217 Pac. (2d) 549.

Messrs. Church and Harris, Great Falls, and Mr. William M. Maxfield, San Francisco, California, for appellant.

Mr. Charles Davidson, Great Falls, for respondent.

Mr. Leo C. Graybill, Great Falls, amicus curiae.

MR. JUSTICE ANGSTMAN:

On rehearing the opinion promulgated herein on the 20th day of October, 1949, is hereby withdrawn and the following opinion substituted therefor.

Plaintiff recovered a verdict and judgment against defendant

in the sum of $7,667.11 for damages alleged to have been sustained by reason of losing 474 sheep which died from eating oil cake pellets manufactured by defendant from grain and mustard screenings and sold to plaintiff. Defendant's motion for a new trial was denied and it has appealed from the judgment.

The record without conflict shows that the pellets which were fed to plaintiff's sheep were manufactured by defendants.

The principal contention of defendant is that certain instructions, over objection, were erroneously given to the jury. Among them was an instruction in practically the same language as section 27-101, R. C. M. 1947. It provides: "It shall be unlawful for any person, persons, firm, or corporation, within this state, to manufacture for sale within this state, sell, offer for sale, or have within his or their possession, with the intent to sell within this state, any drugs or article of food which is adulterated or misbranded within the meaning of this act. The term 'drug' as used in this act, shall include all medicines or preparations recognized in the United States Pharmacopoeia or National Formulary for internal or external use, and any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or animals. The term 'food,' as used in this act, shall include all articles used as food, drink, confectionery, or condiment by man or animals, whether simple, mixed or compound." Embraced in the instruction was a charge that, "Food is deemed to be adulterated if any valuable constituent has been wholly or in part abstracted from it." This was in conformity with subdivision Fourth, Section 27-102; R. C. M. 1947.

Defendant contends that there was no evidence to show that the food in question was adulterated within the meaning of the statute and hence that it was error to give the instruction.

Subdivision 4 of section 27-102, R. C. M. 1947, provides that food is adulterated "if any valuable constituent has been wholly or in part abstracted from it." The record shows that the pellets in question were manufactured from screenings from the harvest of wheat. Mustard screening pellets were made from

mustard seed and grain screening pellets were made from grain screenings. The process consisted of cooking and crushing the seeds, extracting oils therefrom and pressing the residue into pellets. There was evidence that the screenings in their natural form had been used for sheep feed over a period of years without any harmful results.

After plaintiff's sheep died some of the remaining pellets were tested by the Montana Livestock Sanitary Board at Helena. That board tried the pellets on a number of sheep. Some died and some showed no bad results. Those conducting the experiments, after examining the contents of the paunches of the dead sheep, testified that in their opinion the sheep died because of eating the pellets. No useful purpose would be subserved in pointing out the details of the testimony relied upon to show a violation of sections 27-101 and 27-102, R. C. M. 1947.

There is evidence showing that in the process of manufacturing the pellets, bland or non-irritating oils were extracted from the seeds. A substance called glucoside which is capable of forming volatile oil of mustard was allowed to remain in the product. There was evidence showing that the sheep that died were killed by a toxic substance or poison as a result of eating the pellets. The toxic substance or poison was volatile oil of mustard. Bland oil, which was removed from the seeds in the manufacturing process, operates as an antidote and counteracts the effect of volatile oil of mustard.

It is the contention of plaintiff that this evidence shows that by the removal of the bland oil there was abstracted from the seeds wholly or in part a valuable constituent within the meaning of subdivision 4 of section 27-102, R. C. M. 1947.

This contention overlooks the fact that it was not seeds as such that were sold by defendant. What it sold was pellets. The record shows too that plaintiff knew it was purchasing pellets and that they constituted the residue after the bland oil was pressed from the seeds. One purpose of the Food and Drug Act is to prevent the practice of deception.

It is not unlawful to sell skimmed milk on the theory that a

necessary constituent or ingredient, viz., the cream, has been removed from it. Commonwealth v. Hufnal, 185 Penn. 376, 39 A. 1052.

A case very similar to this is that of Rose v. State of Ohio, 11 Ohio Cir. Ct. R. 87. That case involved a statute practically identical with subdivision 4 of our section 27-102. The article claimed in that case to be adulterated was sold under the name of cocoa. It was manufactured from cocoa bean which is a natural product of the tree known as the cocoa tree. Cocoa was manufactured from the cocoa bean by extracting from the bean a large percentage of the fat.

The court in holding that the article sold was not adulterated, said: "If the word 'cocoa' is the proper name, recognized by the public, and by those engaged in the purchase and sale of articles of food, of the article sold by Rose, and if that is the name by which such article was known for many years prior to the enactment of the statute under consideration, then, it would seem to follow that it was this manufactured product from which nothing should be abstracted, rather than the cocoa bean being that from which nothing may be abstracted, and still leave a salable product."

So here the pellets or oil cake is what was sold by defendant rather than the seeds from which they were manufactured by abstracting the oil.

The record shows that plaintiff knew it was obtaining oil cake or pellets and that they were manufactured from seeds by extracting the oil from the seeds.

Plaintiff contends that the extraction of the bland oil under the facts here constituted "adulteration" under the principles announced in United States v. Forty Barrels, 241 U. S. 265, 36 S. Ct. 573, 577, 60 L. Ed. 995. There the question presented was whether an added ingredient constituted adulteration when the added ingredient, caffeine, had for more than 20 years constituted a part of "coca cola" and sold under the name of "coca cola."

The court in holding that the distinctive name of the food, and the length of time it had been on the market, would not save it from the condemnation of the statute, said: "The fundamental contention of the claimant, as we have seen, is that a constituent of a food product having a distinctive name cannot be an 'added' ingredient. In such case, the standard is said to be the food product itself which the name designates. It must be, it is urged, this 'finished product' that is 'adulterated.' In that view, there would seem to be no escape from the conclusion that, however poisonous or deleterious the introduced ingredient might be, and however injurious its effect, if it be made a constituent of a product having its own distinctive name it is not within the provision. If this were so, the statute would be reduced to an absurdity. Manufacturers would be free, for example, to put arsenic or strychnine or other poisonous or deleterious ingredients with an unquestioned injurious effect into compound articles of food, provided the compound were made according to formula and sold under some fanciful name which would be distinctive. When challenged upon the ground that the poison was an 'added' ingredient, the answer would be that without it the so-called food product would not be the product described by the name. Further, if an article purporting to be an ordinary food product, sold under its ordinary name, were condemned because of some added deleterious ingredient, it would be difficult to see why the same result could not be attained with impunity by composing a formula and giving a distinctive name to the article with the criticized substance as a component part. We think that an analysis of the statute shows such a construction of the provision to be inadmissible."

It is our view that that case does not aid us in the solution of the question before us.

The only way in which the statute could be violated so far as ▮ abstracting a valuable constituent is concerned is that the element or ingredient abstracted must be from the product sold. Here there was no constituent abstracted from the pellets.

It then remains to determine whether the giving of instructions regarding a violation of these statutes was prejudicial. One instruction complained of reads: "You are instructed that the law of Montana known as the Pure Food & Drug Act provides that it is unlawful for any person, persons, firm or corporation within this state, to manufacture for sale, within this state sell, offer for sale, or have within his or their possession, with the intent to sell within this state, any articles of food which is adulterated. The term 'food' includes the articles used as food, drink, confectionery or condiment by man or animals, whether simple, mixed or compounded. Food is deemed to be adulterated if any valuable constituent has been wholly or in part abstracted from it." Another instruction given was as follows: "If you find by preponderance of all the evidence that the Defendants sold to the Plaintiff the twenty sacks of pellets in question to be used as food for Plaintiff's sheep, and that said pellets were adulterated as defined in these instructions, the Defendants are guilty of negligence; that if you further find from a preponderance of all the evidence that such negligence was the proximate cause of the loss, if any, which Plaintiff suffered, then the verdict must be for Plaintiff unless you further find by a preponderance of all of the evidence that the Plaintiff was guilty of contributory negligence as defined in these instructions."

Since there was no evidence showing or tending to show that any valuable constituent or any element whatsoever was abstracted from the pellets, the article that was sold by defendant, the instructions above quoted could serve only to confuse and mislead the jury.

The applicable rule is stated in 53 Am. Jur., "Trial," sec. 579, p. 455, as follows: "The scope of an instruction in a particular case, whether civil or criminal, is to be determined not alone by the pleadings therein, but also by the evidence in support of the issues; and even though an issue is raised by the pleadings, it is not proper to give an instruction thereon where there is no basis for it in the evidence. An instruction not based on the evidence is erroneous in that it introduces before the jury

facts not presented thereby, and is well calculated to induce them to suppose that such state of facts in the opinion of the court is possible under the evidence and may be considered by them.''

For error in this respect the cause must be remanded for a new trial.

Other questions which may arise upon another trial and which are presented by the record will now be considered by us pursuant to our duty under section 93-216, R. C. M. 1947.

The court gave an instruction in the language of section 74-316, R. C. M. 1947, reading: ''One who manufactures an article under an order for a particular purpose, warrants by the sale that it is reasonably fit for that purpose.''

Defendant contends that an instruction based upon section 74-316 was improper because there was no evidence that the pellets were manufactured under an order for a particular purpose within the meaning of that section.

The evidence shows that plaintiff had ordered about 60 tons of linseed pellets from defendant, this being the kind of feed that plaintiff customarily used. Defendant was unable to supply that amount of linseed pellets and suggested to it that it try the pellets which poisoned the sheep. The latter pellets were already manufactured by defendant before they were ordered by or sold to plaintiff and constituted a part of defendant's stock on hand. There is merit in defendant's contention that the evidence does not show that the pellets in question were manufactured under an order for a particular purpose. Compare 22 Cal. Jur., sec. 73, at p. 1001, and Correio v. Lynch, 65 Cal. 273, 3 Pac. 889; Lukens v. Freiund, 27 Kan. 664, 41 Am. Rep. 429.

On another trial the court should not give an instruction based upon section 74-316.

The court also gave an instruction in the language of section 74-321, R. C. M. 1947. That section reads: ''One who makes a business of selling provisions for domestic use warrants, by a sale thereof, to one who buys for actual consumption, that they are sound and wholesome.''

Defendant contends that this section of the statute was not applicable because there was no sale of the pellets by defendant to plaintiff. It is true that defendant's evidence was to the effect that the pellets were not sold to plaintiff but were furnished simply for trial and experiment. Likewise the invoice that was furnished to plaintiff with the pellets simply listed them and there was marked after the listing the word "(Trial)" without any price being stated.

However, Mr. Seaton, president of the plaintiff corporation, testified that when he received the pellets he had a conversation with Mr. Simpson, the manager of the defendant company, and was told that if he could use the pellets "they would price them to me in proportion of the protein of the pellets in relation to the linseed pellets."

Mr. Simpson also testified that he told Mr. Seaton that the grain screening pellets would be considerably cheaper than the linseed pellets which plaintiff was then feeding. From the evidence offered by plaintiff, he expected to pay for the pellets if they proved palatable.

This evidence was sufficient to make it a jury question as to whether the pellets were sold by defendant to plaintiff.

Defendant contends that section 74-321 has no application because the pellets were not purchased by plaintiff for human consumption, it being contended that section 74-321 has to do only with food intended for consumption by human beings and not to food for animal use. The statute deals with "provisions for domestic use" bought for "actual consumption." Corn, oats and bran have been held to come within the meaning of the word "provisions" as used in a mechanics' lien statute. Kansas City Ft. S. & M. R. Co. v. Graham, 67 Kan. 791, 74 Pac. 232.

Also horse feed has been held to be within the meaning of the word "provisions" in a mechanics' lien statute. Clatsoy County, ex rel. Higgins & Co. v. Feldshau, 99 Or. 680, 196 Pac. 379. And compare Franzen v. Southern Surety Co., 35 Wyo. 15, 246 Pac. 30, 46 A. L. R. 496, and Overman & Co. v. Maryland Casualty Co., 193 N. C. 86, 136 S. E. 250.

Domestic use of water comprehends water used for watering animals. Water Supply Co. of Albuquerque v. City of Albuquerque, 17 N. M. 326, 128 Pac. 77, 43 L. R. A., N. S., 439; Montrose Canal Co. v. Loutsenhizer Ditch Co., 23 Colo. 233, 48 Pac. 532.

To "consume" means, "To destroy the substance of, esp. by fire;—formerly and still figuratively used of any destructive or wasting process, as evaporation; decomposition; and disease. 2. To spend wastefully; hence to use up; expend; waste, * * * 4. To eat or drink up (food), devour." Webster's New International Dictionary, 2d Edition. Provisions are actually consumed by being eaten by animals the same as if eaten by human beings. The statute is not confined to food consumed by human beings but is sufficiently broad to include provisions consumed by animals.

There are cases relied upon by defendant holding that where a foreign substance, the presence of which an inspection would have disclosed, accidentally finds its way into animal food the seller is not liable on an implied warranty. Typical of such cases are Lukens v. Freiund, supra, and National Cotton Oil Co. v. Young, 74 Ark. 144, 85 S. W. 92, 109 Am. St. Rep. 71, 4 Ann. Cas. 1123.

Here, however, there was no foreign substance that entered the product sold by defendant. According to the evidence above pointed out the product sold by defendant was itself unwholesome and poisonous without foreign matter entering it. No amount of inspection short of a chemical analysis would have disclosed the poisonous condition of the feed. Under such circumstances, and in the light of our statute section 74-321 there is a warranty of soundness and wholesomeness even though the food is for animal consumption. Larson v. Farmers' Warehouse Co., 161 Wash. 640, 297 Pac. 753, and cases therein cited; and McBride v. Farmers' Seed Ass'n, 248 Ky. 514, 58 S. W. (2d) 909.

We hold therefore the instruction which followed the language of section 74-321 was proper.

Defendant contends that the court erred in giving instruction No. 4, reading: "You are instructed that one who makes a business of selling provisions for domestic use warrants, by a sale thereof, to one who buys for actual consumption, that they are sound and wholesome. That by this statute the Defendants in this case are made the insurers of the purity of the food product sold by it to plaintiff and whether or not the Defendants knew of the impure condition of the food, if it were impure, is immaterial in this case."

The effect of section 74-321 is to make the seller an insurer of the soundness and wholesomeness of the provisions sold for domestic use. Standing alone that section extends the warranty only to the immediate purchaser. Kelley v. John R. Daily Co., 56 Mont. 63, 181 Pac. 326.

But read in conjunction with section 27-101 et seq., the warranty goes also to the general public. Bolitho v. Safeway Stores, Inc., 109 Mont. 213, 95 Pac. (2d) 443; Kelley v. John R. Daily Co., supra.

But here the sale was by the manufacturer direct to plaintiff and section 74-321 applies without reference to sections 27-101 et seq. and the instruction complained of was proper.

It is next contended by defendant that the evidence shows that plaintiff fed the pellets to its sheep on the second day after it had notice that the first day's feeding had killed some of the sheep and that such as were killed by the second day's feeding plaintiff's acts alone were responsible and that plaintiff's proof did not establish defendant's acts as the proximate cause of the second day's loss. Defendant pleaded plaintiff's negligence as the proximate cause of its loss.

Before defendant furnished the 20 sacks of pellets to plaintiff it gave him one sack and this plaintiff reported to defendant its sheep would not eat. Defendant then instructed plaintiff not to feed anything else to the sheep except the 20 sacks of pellets. These defendant knew were to be fed to 2,400 head of sheep and were to represent four days' feeding of 500 pounds

per day. There is evidence that plaintiff thought that the first sheep that died or were taken sick probably did so because of chokecherry leaves. The issue was one to be submitted to the jury as to whether plaintiff's negligence, if any, was the proximate cause of some or all of its loss.

Other questions have been raised by appellant but they need not be considered since it is unlikely that they will arise upon another trial.

The judgment is reversed and the cause remanded for a new trial.

ASSOCIATE JUSTICES FREEBOURN and METCALF, concur.

MR. CHIEF JUSTICE ADAIR, dissenting:

Liability of the manufacturer of provender for injury or loss occasioned by the unwholesome, unfit, deleterious or poisonous condition of his product is generally founded upon (a) the law as it relates to warranties, express or implied, or (b) upon the law of negligence.

An action for breach of warranty arises *ex contractu,* the universal rule being that a warranty, either express or implied, must grow out of contractual relations between the parties.

An action to recover damages for injury or loss occasioned by the manufacturer's failure to exercise the proper degree of care, skill or diligence sounds in tort and arises *ex delicto,* being based upon the principles of negligence.

R. C. M. 1947, sec. 74-321, provides: "One who make a business of selling provisions for domestic use *warrants,* by sale thereof, to one who buys for actual consumption, that they are sound and wholesome." Emphasis supplied.

The trial court's instruction No. 4 reads: "You are instructed that one who makes a business of selling provisions for domestic use warrants, by a sale thereof, to one who buys for actual consumption, that they are sound and wholesome. *That by this statute the Defendants in this case are made the insurers of the*

*purity of the food product sold by it to plaintiff and whether or not the Defendants knew of the impure condition of the food, if it were impure, is immaterial."* Emphasis supplied.

The first sentence of the above instruction is in the language of the statute (74-321, supra) and states the law of this state as written by the legislature. The second sentence, being the italicized portion of the instruction, is not an enactment of the legislature but is purely and simply a judge-made addition inserted in a plainly worded statute adversely affecting the statutory obligations of the manufacturer or seller of provender, in direct violation of the provisions of R. C. M. 1947, sec. 93-401-15, which says: "In the construction of a statute * * * the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted * * *."

Only ordinary words appear in section 74-321, supra. The language is plain, simple, direct and wholly without ambiguity and the courts must presume the legislature intended exactly what it plainly said. It is the duty of judges to confine themselves to the words of the legislature,—nothing adding,—nothing diminishing. The legislature says the seller "warrants" that his provisions "are sound and wholesome,"—not that manufacturers and sellers "are made the *insurers* of the purity of the food product sold by" them as is stated in the last sentence of the trial court's instruction No. 4, supra.

The power to define is the power to legislate. In the exercise of the power to legislate vested in it by the Constitution, the Montana legislature saw fit to write into the law governing the obligations of manufacturers and sellers of provender and provisions its own definition of the word "warranty" as it wrote into the law of insurance its own definition of the word "insurance" and into the law of indemnity its own definition of the word "indemnity."

Chapter 3 of Title 74, R. C. M. 1947, comprising twenty-four separate code sections, numbered 74-301 to 74-324, inclusive, is

entitled: "Rights and Obligations of Seller—Delivery and Warranty." It was proper to inform the jury as to the meaning of the term "warranty" but the definition given the jury should be that enacted into law by the legislature rather than an inaccurate or inappropriate use of the term that is in opposition to that intended and enacted into law by the lawmakers of this state.

"Warranty" as used in the code sections governing sales, is defined by the Montana legislative assembly thus: "A warranty is an engagement by which a seller assures to a buyer the existence of some fact affecting the transaction, whether past, present, or future." R. C. M. 1947, sec. 74-309. In each of the thirteen code sections (74-310 to 74-322, inclusive) immediately following section 74-309, supra, defining "warranty" the lawmakers have used the verb "warrants" and they employed such word as they defined it by valid legislative enactment.

In none of the twenty-four code sections comprising Chapter 3 of Title 74, supra, defining the rights and obligations of the seller, has the legislature said that the seller is an "insurer."

"Insurance" is defined in R. C. M. 1947, section 40-101, thus: "Insurance is a contract whereby one undertakes to *indemnify* another against loss, damage, or liability arising from an unknown or contingent event." Emphasis supplied.

"Indemnity" is defined in R. C. M. 1947, section 30-301, thus: "Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person."

Nowhere has the legislature provided that *ipso facto* a contract of *indemnity* is created by the mere sale of foods for either man or beast.

There is a well-defined distinction between "warranty" and "insurance." "A warranty promises indemnity against defects in the article sold, while insurance indemnifies against loss or damage resulting from perils outside of and unrelated to defects in the article itself." State ex rel. Duffy v. Western Auto Supply Co., 134 Ohio St. 163, 16 N. E. (2d) 256, 259, 119 A.

L. R. 1236, and annotation. See: 44 C. J. S., Insurance, sec. 1, pages 473, 474, and 55 C. J., Sales, secs. 667, 668, pp. 652, 653, defining "warranties."

In Kelley v. John R. Daily Co., 56 Mont. 63, 74, 181 Pac. 326, 329, the author of the opinion either by accident, mistake or inadvertence, employed the word "insurer" instead of the word "warrantor," saying that a "seller is made the *insurer* of the purity of food products sold by him," citing, as his authority, the cases of Rinaldi v. Mohican Co., 171 App. Div. 814, 157 N. Y. S. 561, and Catani v. Swift & Co., 251 Pa. 52, 95 A. 931, L. R. A. 1917B, 1272. Neither case supports the statement made. Neither case mentions the word "insurer." Each is based only upon an "implied warranty." See Rinaldi v. Mohican Co., 225 N. Y. 70, 121 N. E. 471, affirming the cited New York case (an excellent decision on implied warranty.)

In the Kelley case, supra, 56 Mont. at page 74, 181 Pac. at page 329, the sentence immediately following the citation of the Rinaldi case and the Catani case clearly shows that the word "insurer" was inadvertently and inaccurately substituted for the word "warrantor" for the court then said: "Under section 5115, Revised Codes, the *warranty* of food offered for sale extended only to the immediate purchaser, evidently upon the theory that it arose out of the contractual relations of the parties. Under chapter 130 the *warranty* extends to the public generally * * *." Emphasis supplied. In other words, the Kelley case is based on "warranty" instead of "insurance" and the question of insurance was not there involved.

Bolitho v. Safeway Stores, Inc., 109 Mont. 213, 95 Pac. (2d) 443, quotes the above from the Kelley case, and then says, 109 Mont. at page 217, 95 Pac. (2d) at page 445: "Defendant contends that plaintiff's action is based upon a violation of sections 2578 et seq., Revised Codes [now R. C. M. 1947, sec. 27-101] and not upon section 7618 [now R. C. M. 1947, sec. 74-321]. It is our view that the action is based upon a violation of section 7618, as well as sections 2578 et seq." Nowhere in the pure food law (R. C. M. 1947, secs. 27-101 to 27-120) is the word "insurer"

used and the court held that a sale of adulterated or misbranded food is a violation of R. C. M. 1947, sec. 74-321, supra.

Neither the Kelley case nor the Bolitho case may be said to authorize the giving of the trial court's instruction No. 4 declaring the defendant to be an "*insurer*" of the product sold.

The record shows the pellets were manufactured by defendant, so its obligation for latent defects therein is governed by sections 74-315 and 74-321, R. C. M. 1947, neither of which makes the manufacturer an *insurer*.

The majority opinion correctly concluded that the Pure Food and Drug Act has no application in this case. The statutes defining the obligations of manufacturers and sellers of provisions and provender control and none of these makes an insurer of the manufacturer for it is the law "that a manufacturer is not an insurer of his food products." Armour & Co. v. Miller, 39 Ga. App. 228, 147 S. E. 184, 186.

Since this case is being remanded to the district court for a new trial, it becomes highly important that the next jury be correctly instructed on the law prescribing the obligations of the manufacturer or seller of food stuff. The court and the jury should take the law as they find it. The law as written by the legislature controls, namely: "One who makes a business of selling provisions for domestic use *warrants,* by sale thereof, to one who buys for actual consumption, that they are sound and wholesome." R. C. M. 1947, sec. 74-321. Emphasis supplied. The trial court's instruction No. 4 should have so stated and there stopped. To go further not only invades the field reserved for the legislature but nullifies the lawful enactments of that branch of our government.

The case of Leonidas v. Great Northern Railway Co. et al., 105 Mont. 302, 318, 72 Pac. (2d) 1007, 1012, was an appeal by the defendant railway company from a judgment entered on the verdict of a jury awarding the plaintiff, George Leonidas $8,000 damages for personal injuries suffered by him while in the company's employ. In affirming the judgment this court reached the correct result but gave the wrong reasons therefor.

In construing the Federal Employers' Liability Act, 45 U. S. C. A., sec. 51 et seq., this court there held that the defense of assumption of risk was not available and that the act "makes the carrier an *insurer* of the competency and carefulness of its agents and employees." Emphasis supplied. Of course the statute does not make "the carrier an insurer." Because of such erroneous ruling the Supreme Court of the United States, on petition of the railway company, caused a writ of certiorari to issue (see Great Northern Ry. Co. v. Leonidas, 305 U. S. 1, 59 S. Ct. 51, 83 L. Ed. 3) with resultant delay, prolonged litigation, expense and untold suffering to the injured employee. While the litigation was in progress the employee, George Leonidas, was wrongfully committed to the State Hospital for the Insane. True he was later restored to capacity but this came about only after another hard-fought legal battle in this court. See State ex rel. Leonidas v. Larson et al., 109 Mont. 70, 92 Pac. (2d) 774. After acquainting the members of the 26th legislative assembly with the facts, legislation was passed amending the statutes governing the examination, hearing and commitment of persons charged with being insane. Such enactment divested county commissioners of all authority to conduct insanity hearings or order commitments. See Chapter 117, Laws of 1939. To hold that the obligation of a manufacturer selling provender for animals is that of an *insurer* is as erroneous as this court's ruling that the Federal Employers' Liability Act makes the carrier an *insurer*.

1 Cooley's Briefs on Insurance, 2d Ed., sec. 114, says: "The primary requisite essential to the existence of every contract of insurance is the presence of a risk of loss. The dominant feature of the contract is to grant indemnity or security against loss by reason of the risk. Everly v. Equitable Surety Co., 190 Ind. 274, 130 N. E. 227."

1 Couch Cyclopedia Insurance Law, sec. 61, p. 82, says: "A risk, which ordinarily means the liability assumed as specified on the face of the policy, is of the very essence of insurance and forms the very foundation of the contract."

44 C. J. S., Insurance, sec. 1, page 471, defines "insurance" as "a contract by which one party, for a compensation called the 'premium,' assumes particular risks of the other party. * * *"

29 Am. Jur., Insurance, sec. 3, p. 47, says: "* * * the essential features of policies of insurance at the present time is substantially that of indemnity to the insured."

To hold that every time a merchant sells a bag of chicken feed, cotton seed cake or mustard seed pellets the price paid him therefor constitutes a "premium"—the contract entered upon is one of "insurance" and the liability assumed, in case of loss, is that of an "insurer" does violence to the plain language of the statute and imposes upon merchants obligations and liabilities never intended nor contemplated by the legislature or by the law of sales.

Business should not be unduly interfered with or restricted. It should be permitted as much freedom in the conduct and management of its affairs as is consistent with the public interest and welfare. This case should be tried and decided upon the law as written and enacted by the legislature without inserting additional words, obligations or liabilities into a plainly worded statute.

MR. JUSTICE BOTTOMLY concurs in the foregoing dissent.

On Appellant's Motion to Modify Opinion

MR. JUSTICE ANGSTMAN:

Defendant has filed a motion to modify the opinion so far as it holds that it was proper to instruct the jury that to warrant the wholesomeness of provisions sold for domestic use under section 74-321, R. C. M. 1947 (sec. 7618, R. C. M. 1935) is meant that the sellers are made the insurers of the purity of the food product sold by them and that whether they know of the impure condition of the food is immaterial.

To warrant means: "a. To secure to, as a grantee, an estate granted; to assure. b. To secure to, as a purchaser of goods, the title to the same; to indemnify against loss. c. To se-

cure to, as a purchaser, the quality or quantity of the goods sold, as represented; to secure (a purchaser or grantee) by a warranty. See Warranty, n., 2. d. To assure, as a thing sold, to the purchaser; that is, to engage that the thing is what it appears, or is represented, to be, which implies a covenant to make good any defect or loss incurred by it.'' Webster's New International Dictionary.

''As a verb, the word means to defend; to guarantee; to enter into an obligation of warranty.'' Ballentine Law Dictionary.

When a seller warrants that food is sound and wholesome he ▮▮▮ thereby covenants to make good any defect or loss incurred by its use by the consumer. That is exactly what is meant by an insurer of the purity of the same product.

It is not error to give an instruction to that effect. It is proper ▮▮▮ that the jury be informed of the meaning of the term ''warrant'' and that is all the instruction does.

The motion for modification is denied.

ASSOCIATE JUSTICES FREEBOURN and METCALF, concur.

MR. CHIEF JUSTICE ADAIR and MR. JUSTICE BOTTOMLY, dissenting:

In our opinion defendant's motion to modify the majority opinion pronounced after rehearing granted and had should be allowed for the reasons stated and upon the authorities cited in the dissenting opinion of Chief Justice Adair herein.

Rehearing denied April 19, 1950.