No. 05-186

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 109

PETER and TANYA ROTHING, d/b/a
DIAMOND R ENTERPRISES, INC.,

    Plaintiffs and Appellants,

  v.

ARNOLD KALLESTAD,

    Defendant and Respondent.

APPEAL FROM:    The District Court of the Eighteenth Judicial District,
                In and For the County of Gallatin, Cause No. DV 2001-291,
                Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Calvin J. Stacey (argued), Stacey & Funyak, Billings, Montana

        For Respondent:

            James R. Halverson (argued), Herndon, Sweeney & Halverson,
            Billings, Montana

                                    Argued:  February 1, 2006
                                  Submitted:  February 14, 2006
                                   Decided:  May 8, 2007

Filed:

        _____
                            Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Peter and Tanya Rothing (the Rothings) brought this action to recover damages resulting from the death of nineteen horses owned by the Rothings that they alleged were fed botulism contaminated hay purchased from Arnold Kallestad (Kallestad). The Rothings sought recovery under theories of strict liability in tort, negligence and breach of contract. The District Court for the Eighteenth Judicial District, Gallatin County, granted Kallestad's Motions for Summary Judgment thereby dismissing the Rothings' Amended Complaint. The court also granted two Motions to Compel filed by Kallestad, awarded Kallestad his attorney's fees and granted Kallestad's Motion for a Protective Order regarding the determination of attorney's fees. The Rothings appeal. We affirm in part, reverse in part and remand for further proceedings consistent with this Opinion.

¶2 The Rothings raise several issues on appeal which we have restated as follows:

¶3 1. Whether the District Court erred in concluding that hay is not a "product" for purposes of a strict liability in tort cause of action.

¶4 2. Whether the District Court erred in concluding that the Rothings' negligence claim against Kallestad fails because it was unforeseeable that the hay could cause injury and death to the Rothings' horses, thus no duty of care existed.

¶5 3. Whether the District Court erred in concluding that the Rothings' breach of contract claim against Kallestad fails because it was unforeseeable that the hay could cause injury and death to the Rothings' horses.

¶6 4. Whether the District Court erred in imposing discovery sanctions against the Rothings.

2

¶7 5. Whether the District Court erred in awarding attorney's fees to Kallestad and denying the Rothings a hearing in respect to the calculation of attorney's fees.

¶8 Because we find the Rothings' breach of contract claim dispositive of this case, we do not address the Rothings' strict liability and negligence claims.

**Factual and Procedural Background**

¶9 The Rothings conducted business near Belgrade, Montana, under the name Diamond R Enterprises which included Diamond R Stables, Diamond R Kennels and Diamond R Cattle Company. Diamond R Stables is involved in the breeding, training and selling of horses; Diamond R Kennels is involved in the breeding of Labrador Retrievers; and Diamond R Cattle Company is involved in breeding, raising and selling miniature heifers.

¶10 Kallestad owns a ranch in Gallatin County where he primarily raises hay and a small amount of grain. He also raises Red Angus cattle on the ranch. Each year since he began ranching in 1984, Kallestad has sold some of the hay he raised, and at times, he has advertised his hay for sale in the Bozeman Daily Chronicle. Kallestad estimated that he sells between 300 and 1,000 tons of hay annually.

¶11 Tanya Rothing's father, Steven Howells, is in the trucking business and, from time to time, he purchased and transported hay from North Dakota to the Rothings in Belgrade. In April 2001, the Rothings needed hay for their horses. Because Howells did not have time to go to North Dakota to get the hay that he had planned to deliver to the Rothings, the Rothings purchased hay from Kallestad for $90.00 a ton.

3

¶12   Kallestad later testified that this hay was a second-cutting of alfalfa taken from a field that had been re-seeded approximately two years earlier. The hay was cut with a swather and allowed to dry for two to four days depending on the temperature. The hay was then twin-raked (wherein two rows are turned and combined so that the bottom portion can also dry) and baled with a mid-size square baler a day or two after being raked. The bales were then stacked outside on a raised bed of gravel and fly ash from August 2000 until April 2001 when it was sold to the Rothings.

¶13   Kallestad further testified that the hay was exposed to moisture during the winter months and that, one winter, a ditch near the stacked hay overflowed causing water to go along the west side of the stack of hay and then onto a road. Kallestad was unsure whether the ditch water came in contact with the hay, but he indicated that the water "may have been up there an inch or so."

¶14   On April 23, 2001, the Rothings received 45 to 48 large bales of hay from Kallestad. Some of the hay was fed to the Rothings' horses the same day it was delivered. On May 2, 2001, nine days after the delivery of the hay, one of the Rothings' yearling colts was found "down." That afternoon, the colt was taken to the Hardaway Veterinary Hospital in Belgrade where the colt had to be euthanized. The following day, two other yearling colts exhibited similar signs as the first colt. One of these yearling colts also had to be euthanized. The body was transported to the Marsh Laboratory at Montana State University where a post mortem was performed by Dr. Bill Layton. The other yearling colt was treated with charcoal, but died two days later.

4

¶15    On May 3, 2001, Dr. Layton contacted Dr. Robert Whitlock at the University of Pennsylvania. Dr. Whitlock is an Associate Professor of Medicine and the Director of the Botulism Laboratory at the University. Dr. Layton inquired about sending diagnostic samples to be tested for botulism.

¶16    On May 4, 2001, three mares with foals exhibited symptoms similar to the others. They were taken to the Hardaway Veterinary Hospital and treated with charcoal and other medications. One of the foals died during the night. The treating veterinarians, Dr. Gordon Hardaway and Dr. Thomas Jakob, suspected that the hay purchased from Kallestad may be the cause of the problem, hence the remaining hay was removed from the feeding area.

¶17    Shortly thereafter, Dr. Whitlock shipped botulism antitoxin to the Rothings and their veterinarians, but by the time the outbreak was over, nineteen animals had died. Dr. Whitlock concluded that the hay purchased from Kallestad and fed to the Rothings' horses was contaminated with botulism. He based his opinion on diagnostic studies and testing which he performed on numerous samples taken from the Rothings' property as well as the location where the hay had been stored on Kallestad's property. Some of the hay samples that were tested showed evidence of preformed *Clostridium botulinum* type B toxin.

¶18    The Rothings filed suit against Kallestad on July 26, 2001. In their suit, the Rothings pursued theories of recovery based upon strict liability, negligence and breach of contract. As a result of this incident, the Rothings claimed that they suffered significant damages, including veterinarian bills for services and antitoxin in the amount

of $38,549.28; the value of the nineteen dead horses in the amount of $40,000; and the loss of income as a result of the deaths of the nineteen horses in excess of $100,000. They also sought damages for emotional distress from watching their horses die and the resulting economic devastation to their business.

¶19 In addition, Dr. Whitlock advised the Rothings that, as a result of this incident on their property, they are at a greater risk of a reoccurrence of botulism poisoning in their horses and they should vaccinate all of their horses yearly for as long as they own the property. Dr. Whitlock also recommended that the Rothings warn all individuals who might bring mares to be bred on their property of this incident and that if the Rothings ever sell their property, they should disclose this incident. As a consequence, the Rothings maintained that the value of their property has diminished. They also claimed that they have incurred expenses for cleaning up their property as a result of the contaminated hay and for additional feed costs.

¶20 Kallestad filed two separate Motions for Summary Judgment. In his first motion, filed May 13, 2003, Kallestad argued that, under Montana law, hay is not a product and he is not a manufacturer; therefore, he was entitled to summary judgment on the Rothings' strict products liability claim. In his second motion, filed June 22, 2004, Kallestad argued that the Rothings' remaining theories of negligence and breach of contract should be dismissed because, if botulism was present, it was in no way foreseeable.

¶21 The District Court granted both of Kallestad's Motions for Summary Judgment in orders filed on January 28, 2004, and August 18, 2004. In addition, the court granted

6

Kallestad's several Motions to Compel; awarded Kallestad attorney's fees incurred in preparing the Motions to Compel; granted Kallestad's Motion for Protective Order; and sanctioned the Rothings by excluding evidence including Dr. Whitlock's report.

¶22 The Rothings appeal all of the orders entered by the District Court including the court's January 28, 2004, and August 18, 2004 orders on Kallestad's Motions for Summary Judgment; the court's June 29, 2004 order excluding evidence and awarding expenses; and the court's orders on Kallestad's various Motions to Compel.

**Standard of Review**

¶23 We review a district court's grant of summary judgment de novo, applying the same evaluation under M. R. Civ. P. 56, as the district court. *Cole ex rel. Cole Revocable Trust v. Cole*, 2003 MT 229, ¶ 8, 317 Mont. 197, ¶ 8, 75 P.3d 1280, ¶ 8 (citing *Vivier v. State Dept. of Transp.*, 2001 MT 221, ¶ 5, 306 Mont. 454, ¶ 5, 35 P.3d 958, ¶ 5). In this regard, we have stated that

> [t]he movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law.

*Cole*, ¶ 8 (quoting *Bruner v. Yellowstone County*, 272 Mont. 261, 264-65, 900 P.2d 901, 903 (1995)). In addition, we review a district court's legal conclusions for correctness. *Cole*, ¶ 8.

**Issue 3.**

7

¶24 *Whether the District Court erred in concluding that the Rothings' breach of contract claim against Kallestad fails because it was unforeseeable that the hay could cause injury and death to the Rothings' horses.*

¶25 The District Court concluded that under *Martel Const. Inc. v. State*, 249 Mont. 507, 817 P.2d 677 (1991), and *Ehly v. Cady*, 212 Mont. 82, 687 P.2d 687 (1984), forseeability is a factor in breach of contract claims in Montana. Hence, the court granted Kallestad's Motion for Summary Judgment on the Rothings' breach of contract claim on the basis that the injuries to the Rothings' horses were not foreseeable.

¶26 However, neither *Martel* nor *Ehly* dealt with a transaction in goods as in the case *sub judice*. In *Martel*, a construction company brought an action against the State to recover interest expenses paid on funds the construction company was required to borrow in order to finance extra work allegedly caused by the State in the reconstruction of a railroad overpass. *Martel*, 249 Mont. at 508, 817 P.2d at 677-78. And in *Ehly*, the purchaser of a parcel of real property brought an action against the sellers and the sellers' broker over the breach of a buy-sell agreement. *Ehly*, 212 Mont. at 86, 687 P.2d at 689.

¶27 In the instant case, the Rothings' purchase of hay from Kallestad was a transaction in goods, thus it may be governed by Montana's Uniform Commercial Code (UCC) pertaining to sales if it meets the other requirements of Title 30, Chapter 2, Montana Code Annotated (1999).[1] Section 30-2-102, MCA, provides: "Unless the context otherwise requires, this chapter applies to transactions in goods . . . ." "Goods" are defined at § 30-2-105(1), MCA, to mean:

---

[1] Because the sale of hay in this case took place on April 23, 2001, the 1999 version of the MCA applies and all references to the MCA are to the 1999 version unless otherwise stated.

8

all things (including specially manufactured goods) *which are movable at the time of identification to the contract for sale* other than the money in which the price is to be paid, investment securities . . . and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty . . . . [Emphasis added.]

Hence, as the Official Comment to § 30-2-105, MCA, provides: "The definition of goods is based on the concept of movability . . . . It is not intended to deal with things which are not fairly identifiable as movables before the contract is preformed." The hay in this case had been cut, baled and stacked and was "movable" at the time the Rothings purchased it from Kallestad.

¶28    Furthermore, in *Mogan v. Cargill, Inc.*, 259 Mont. 400, 403, 856 P.2d 973, 975 (1993), this Court determined that wheat fell within the definition of "goods." Other items determined to be "goods" by this Court include: *Smith v. General Mills, Inc.*, 1998 MT 280, 291 Mont. 426, 968 P.2d 723 (wheat); *Konitz v. Claver*, 1998 MT 27, 287 Mont. 301, 954 P.2d 1138 (timber); *Carelli v. Hall*, 279 Mont. 202, 926 P.2d 756 (1996) (elk); *Trad Industries, Ltd. V. Brogan*, 246 Mont. 439, 805 P.2d 54 (1991) (elk); *Webcor Electronics v. Home Electronics*, 231 Mont. 377, 754 P.2d 491 (1988) (telephone systems); *Norwest Bank Billings v. Murnion*, 210 Mont. 417, 684 P.2d 1067 (1984) (loader); *Little v. Grizzly Mfg.*, 195 Mont. 419, 636 P.2d 839 (1981) (modular home); and *Scott v. Hjelm*, 188 Mont. 375, 613 P.2d 1385 (1980) (horses).

¶29    In addition to the requirement that the transaction consist of the sale of "goods," the seller must meet the definition of a "merchant." A "merchant" under the UCC "means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in

9

the transaction . . . ." Section 30-2-104(1), MCA. Whether or not a person qualifies as a merchant under the UCC is a mixed question of law and fact. *Smith*, 291 Mont. at 430, 968 P.2d at 726 (citing *Dawkins & Co. v. L & L Planting Co.*, 602 So. 2d 838, 843 (Miss. 1992)). We further stated in *Smith* that

> [d]espite the split of authority on this issue, a majority of courts have held that under the Uniform Commercial Code, a farmer may be included under the definition of "merchant" in some instances. However, whether a particular farmer qualifies as a merchant cannot be determined through application of a per se rule; rather, it is a conclusion that must be reached on a case by case basis.

*Smith*, 291 Mont. at 431, 968 P.2d at 726-27 (internal citations omitted).

¶30    Thus, in this case, if the trial court determines that Kallestad was a merchant for purposes of the sale of his hay to the Rothings, then the provisions of the UCC, and more specifically, the Implied Warranty of Merchantability, would apply to this transaction. "Unless excluded or modified [], a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Section 30-2-314(1), MCA.

¶31    Prior to the advent of the UCC, the common law concept of "implied warranty" developed in cases of food stuffs sold for immediate human consumption where "a warranty of soundness or wholesomeness will be implied." *Larson v. Farmers Warehouse Co.*, 297 P. 753, 754 (Wash. 1931). Courts extended the concept of implied warranty to products to be fed to livestock, but initially limited its application to "processed and packaged" food. *See, e.g., Midwest Game Co. v. M.F.A. Milling Co.*, 320

S.W.2d 547, 550 (Mo. 1959) (attaching implied warranty where the animal food "is not in its raw state but has been processed and packaged by the manufacturer").

¶32 The court in *Larson* applied the concept of implied warranty to the sale of goods to be fed to livestock. The owner of four cows purchased two tons of hay in the form of 31 bales from a retail seller of hay. The buyer alleged that the hay contained lead arsenate and had poisoned his cows. *Larson*, 297 P. at 753. Other courts had refused to extend the concept where an inspection of the goods purchased "would have disclosed the presence therein of the injurious articles . . . ." *Larson*, 297 P. at 755. By contrast, no amount of inspection, short of a chemical analysis, would have disclosed the presence of lead arsenate in the hay. As a result, the court concluded that the seller was "liable as for an implied warranty that the hay sold to [the buyer] was not only of the kind and quality ordered, but was, as a lot, generally free from deleterious substances, poisonous to stock." *Larson*, 297 P. at 756. *See also Brown v. Bigelow*, 88 N.E.2d 542 (Mass. 1949) (extending implied warranty to hay); *Thatcher Milling & Elevator, Co. v. Campbell*, 231 P. 621 (Utah 1924) (implied warranty in favor of purchaser of chicken feed); *Gussner v. Miller*, 176 N.W. 359 (N.D. 1920) (implied warranty that hay was fit to be fed to the stock upon a farm).

¶33 This Court also recognized the common law concept of an implied warranty attaching to the sale of animal feed. *Seaton Ranch Co. v. Montana Vegetable Oil & Feed Co.*, 123 Mont. 396, 217 P.2d 549 (1950). The buyer of oil cake pellets brought an action against the seller when 474 sheep died after eating the pellets. The buyer recovered a verdict in his favor and the seller appealed. A sharply divided Court reversed on appeal

11

due to a faulty jury instruction, but in doing so, the Court upheld a separate jury instruction regarding implied warranty. The Court determined that an implied warranty of "soundness and wholesomeness" attached to the sale of food for animal consumption. *Seaton Ranch*, 123 Mont. at 405, 217 P.2d at 554. The Court rejected the notion that the buyer's ability to inspect the product should dissolve the implied warranty as "[n]o amount of inspection short of a chemical analysis would have disclosed the poisonous condition of the feed." *Seaton Ranch*, 123 Mont. at 405, 217 P.2d at 554. *See also Valdosta Milling Co. v. Garretson*, 217 F.2d 625 (5th Cir. 1954) (applying Florida law in determining that implied warranty attached to the sale of horse feed); *G. Bernd Co. v. Rahn*, 96 S.E.2d 185 (Ga. 1956) (implied warranty attached to sale of steamed bone-meal feed supplement intended for cattle).

¶34    Likewise courts in Washington and California applied the common law implied warranty theory to the sale of hay. In *Dougherty v. Lee*, 168 P.2d 54 (Cal. Ct. Apps. 1946), the California Court of Appeals upheld a verdict against the seller of a single ton of Sudan hay, a relatively small amount, where the hay caused the death of plaintiff's dairy cows from botulism poisoning. And, in *Libke v. Craig*, 216 P.2d 189 (Wash. 1950), the Supreme Court of Washington reaffirmed its earlier ruling in *Larson* that the concept of implied warranty applied to the sale of goods to be fed to livestock. In *Libke*, a middleman had purchased hay from the grower and resold it to various parties, including horseback riding academies. The middleman refused to pay for some of the hay that had sickened horses at some of the riding academies. The grower of the hay brought an action for the deficiency and the middleman cross-claimed based on the theory of implied

12

warranty. The court rejected the notion that the seller was relieved of any implied warranty simply because the middleman had inspected the hay prior to purchase. *Libke*, 216 P.2d at 195.

¶35 These principles were carried over into the UCC.[2] Now, under the UCC, goods to be merchantable must be at least such as:

> (a) pass without objection in the trade under the contract description; and
> (b) in the case of fungible goods, are of fair average quality within the description; and
> (c) *are fit for the ordinary purposes for which such goods are used*; and
> (d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and
> (e) are adequately contained, packaged, and labeled as the agreement may require; and
> (f) conform to the promises or affirmations of fact made on the container or label if any.

Section 30-2-314(2), MCA (emphasis added). "Surely goods are not merchantable, if in their ordinary use, the goods cause damage to the property to which they are applied or harm to the person using them." *Streich v. Hilton-Da*vis, Div. of Sterling Drug, 214 Mont. 44, 59, 692 P.2d 440, 448 (1984).

---

[2] The Official Comment to § 30-2-101, MCA, provides: "The coverage of the present Chapter is much more extensive than that of the old Sales Act and extends to the various bodies of case law which have been developed both outside of and under the latter." This language mirrors the Official Comment to Article 2-101 of the UCC. Similarly, the Official Comment to § 30-2-314, MCA, provides: "This section, drawn in view of the steadily developing case law on the subject . . . ." This language mirrors the Official Comment to Article 2-314 of the UCC.

¶36 Here, Kallestad would have breached the Implied Warranty of Merchantability if the trial court determines that the goods were not "fit for the ordinary purposes for which such goods are used," i.e., as feed for livestock. And, under § 30-2-715, MCA, if the trial court determines that Kallestad breached the Implied Warranty of Merchantability, the Rothings may be entitled to both their incidental and consequential damages.

> **Buyer's incidental and consequential damages.** (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
> (2) Consequential damages resulting from the seller's breach include:
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
> (b) *injury to person or property proximately resulting from any breach of warranty.*

Section 30-2-715, MCA (emphasis added). The Official Comment to § 30-2-715, MCA, provides:

> 5. Subsection (2)(b) states the usual rule as to breach of warranty, allowing recovery for injuries "proximately" resulting from the breach. Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of "proximate" cause turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects. If it was not reasonable for him to do so, or if he did in fact discover the defect prior to his use, the injury would not proximately result from the breach of warranty.

This language mirrors the language of the Official Comment to Article 2-715(2)(b) of the UCC.

14

¶37 Furthermore, Article 2-715(2)(b), does not contain a foreseeability requirement, thus a seller "is liable for injury to person or property even if the seller did not know of or have reason to know of the buyer's intended use." James J. White & Robert S. Summers, *Uniform Commercial Code* vol. 1, § 10-4, 733 (5th ed., Thomson West 2006). Analogously, this Court has established that forseeability is not required in connection with causation in negligence cases. *See Prindel v. Ravalli County*, 2006 MT 62, 331 Mont. 338, 133 P.3d 165 ("In order to establish proximate causation, however, the specific injury to a plaintiff need not have been foreseen.") (internal quotation marks and italics omitted); *Busta v. Columbus Hosp. Corp.*, 276 Mont. 342, 916 P.2d 122 (1996) (where this Court held that in cases which do not involve issues of intervening cause, proof of causation is satisfied by proof that a party's conduct was cause-in-fact of damage alleged, and no consideration of foreseeability is required in connection with causation).

¶38 Thus, contrary to the District Court's conclusion that all breach of contract actions in Montana require foreseeability, a breach of contract action under the UCC does not require foreseeability if injury to person or property proximately results from any breach of warranty.

¶39 Accordingly, we hold that the District Court erred in granting Kallestad's Motion for Summary Judgment on the Rothings' breach of contract claim.

**Issue 4.**

¶40 *Whether the District Court erred in imposing discovery sanctions against the Rothings.*

15

¶41    Kallestad contended that because none of the other individuals that he sold hay to during the time period that he sold hay to the Rothings had any problems with their livestock, he was entitled to basic information from the Rothings to respond to their claims.  This information included test results of water samples, feed samples, and tissue samples, along with feed records, veterinarian records and autopsy reports.  Kallestad claimed that the Rothings did not respond to his requests for this information, thus he filed a Motion to Compel on October 29, 2001.  On December 14, 2001, a hearing was held on the motion during which the Rothings' attorney assured the District Court that he would promptly provide the requested discovery information.  Based on these assurances, the District Court denied Kallestad's motion.

¶42    Kallestad filed a renewed Motion to Compel on June 7, 2002, alleging that, despite their assurances, the Rothings still had not responded to his discovery requests approximately six months later.  Attached to Kallestad's brief in support of this motion were eleven letters from Kallestad's counsel to the Rothings' counsel following up on Kallestad's requests for the discovery information.  The District Court granted Kallestad's motion on July 3, 2002.  Kallestad also maintained that because of the Rothings' delays in submitting the information, the District Court had to vacate the original trial date and issue a new scheduling order on July 15, 2002.

¶43    On January 21, 2003, Kallestad filed another Motion to Compel claiming that the Rothings still had not complied with Kallestad's discovery requests and the District Court's July 3, 2002 order.  Kallestad subsequently filed a motion to postpone ruling on this motion when it appeared that the Rothings were about to comply with the discovery

requests. However, Kallestad filed another Motion to Compel on July 11, 2003, based on what he perceived as continuing discovery abuses by the Rothings.

¶44 The Honorable Judge John Larson took over the handling of this case on November 3, 2003. A hearing was held in chambers on or about February 13, 2004, during which Judge Larson ordered the Rothings to produce supplemental discovery within thirty days or evidence would be excluded. The Rothings failed to provide the requested information and on June 29, 2004, the District Court issued an Order to Exclude Evidence and Award Expenses. This order barred the Rothings from presenting any evidence discussing the report of their expert witness, Dr. Whitlock, or their alleged "snowballing credit" damages. In addition, the court ordered the Rothings to pay reasonable attorney's fees and costs for prior discovery violations.

¶45 The Rothings first moved to vacate the court's order and then submitted a request for clarification of the order. In another order dated July 22, 2004, the District Court withdrew the language from its previous order that barred the Rothings from discussing Dr. Whitlock's report. The court further ordered that the matter would be discussed at the hearing scheduled for August 13, 2004, on Kallestad's second Motion for Summary Judgment. During this hearing, the Rothings' counsel informed the court that without Dr. Whitlock's evidence, his clients would have no chance of prevailing at trial.

¶46 The District Court filed its Opinion and Order Granting Kallestad's Motion for Summary Judgment and Order Vacating Trial on August 18, 2004. The only reference to any evidence relating to Dr. Whitlock in the court's order is found in the court's discussion of forseeability regarding the Rothings' negligence claim. The court makes no

mention of its June 29, 2004 order wherein it barred the Rothings from discussing Dr. Whitlock's report, or its July 22, 2004 order wherein it withdrew the language barring the Rothings from discussing that report. However, it is clear from the court's opinion and order wherein it considered the evidence relating to Dr. Whitlock that, although the court had originally excluded such evidence, it reversed that order and vacated such exclusion. Consequently, because the court made no further orders expressly barring any discussion of Dr. Whitlock's report, we conclude that the court's July 22, 2004 order permanently withdrew the proscription against Dr. Whitlock's report.

¶47    In addition, the Rothings contend on appeal that the District Court erred in granting Kallestad's Motions to Compel. They maintain that in doing so, the court did not order the Rothings to respond to any specific written discovery requests or produce specific documentation. Instead, the Rothings argue that the court incorrectly sanctioned them and awarded Kallestad his attorney's fees.

¶48    Kallestad argues that the District Court has discretion to grant motions to compel, to award attorney's fees, and to impose sanctions against those who abuse the discovery process. He maintains that two different judges witnessed the Rothings' "constant delay and non-responsiveness" over the course of three years and that, based on these discovery abuses, the District Court properly granted Kallestad's Motions to Compel, awarded attorney's fees and excluded evidence.

¶49    We review a district court's decision regarding the imposition of sanctions for alleged discovery abuse to determine whether the court abused its discretion. *Richardson v. State*, 2006 MT 43, ¶ 21, 331 Mont. 231, ¶ 21, 130 P.3d 634, ¶ 21 (citing *Estate of*

*Nielsen v. Pardis*, 265 Mont. 470, 478, 878 P.2d 234, 238 (1994); *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 26, 303 Mont. 274, ¶ 26, 16 P.3d 1002, ¶ 26). "In doing so, we generally defer to the district court because it is in the best position to determine both whether the party in question has disregarded the opponent's rights, and which sanctions are most appropriate." *Richardson*, ¶ 21 (citing *Delaware v. K-Decorators, Inc.*, 1999 MT 13, ¶ 86, 293 Mont. 97, ¶ 86, 973 P.2d 818, ¶ 86; *McKenzie v. Scheeler*, 285 Mont. 500, 506, 949 P.2d 1168, 1172 (1997)).

> The purpose of discovery is to promote the ascertainment of truth and the ultimate disposition of the lawsuit in accordance therewith. Discovery fulfills this purpose by assuring the mutual knowledge of all relevant facts gathered by both parties which are essential to proper litigation. Modern instruments of discovery, together with pre-trial procedures, make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.

*Richardson*, ¶ 22 (internal citations and quotation marks omitted).

¶50 Based on our review of the record, including the numerous letters from Kallestad's counsel requesting that the Rothings' counsel provide the requested information or at least respond to counsel's previous letters, we conclude that the District Court did not abuse its discretion in imposing sanctions against the Rothings for discovery abuse. Accordingly, we affirm the District Court's order granting Kallestad's Motion to Compel.

**Issue 5.**

¶51 *Whether the District Court erred in awarding attorney's fees to Kallestad and denying the Rothings a hearing in respect to the calculation of attorney's fees.*

¶52 In its June 30, 2004 Order to Exclude Evidence and Award Expenses, the District Court ordered that the Rothings "shall pay the reasonable fees and costs incurred in the

preparation of the prior motion and brief to compel" and "the reasonable attorney's fees and costs incurred in the preparation of all prior filings other than those [already] covered." On July 22, 2004, the court issued an order setting a hearing on the attorney's fees for the same time as the August 13, 2004 hearing on Kallestad's Motion for Summary Judgment. However, at that hearing, the court granted the parties a week "to file expert affidavit [sic] questioning the hourly rate or the entries, or both." No actual hearing on the reasonableness of the attorney's fees occurred. On February 7, 2005, the court entered its Judgment wherein it ordered that the Rothings pay $4,569.00 in attorney's fees.

¶53 A district court's award of reasonable attorney's fees is a discretionary act and we will not reverse the district court absent an abuse of discretion. *Swenson v. Janke*, 274 Mont. 354, 360, 908 P.2d 678, 682 (1995) (citing *Ihler v. Chisholm*, 259 Mont. 240, 246, 855 P.2d 1009, 1013 (1993), *overruled on other grounds by Porter v. Galarneau*, 275 Mont. 174, 911 P.2d 1143 (1996)). We have also consistently held that it is improper to award attorney's fees based solely on the affidavit of counsel without holding an evidentiary hearing on the matter. *Rossi v. Pawiroredjo*, 2004 MT 39, ¶ 29, 320 Mont. 63, ¶ 29, 85 P.3d 776, ¶ 29 (citing *Stark v. Borner*, 234 Mont. 254, 258, 762 P.2d 857, 860 (1988)). "An award of fees, like any other award, must be based on competent evidence . . . . Furthermore, the proper determination of a legal fee is central to the efficient administration of justice and the maintenance of public confidence in the bench and bar." *Rossi*, ¶ 29 (citing *First Security Bank of Bozeman v. Tholkes*, 169 Mont. 422, 429, 547 P.2d 1328, 1332 (1976)).

¶54 In the case *sub judice*, the District Court should have conducted an evidentiary hearing to demonstrate the proper amount of attorney's fees to be awarded. Without consideration of such evidence, the award of attorney's fees in this case was improper.

¶55 Accordingly, the judgment of the District Court on the issue of attorney's fees is vacated and the cause remanded for an evidentiary hearing to determine the proper amount of attorney's fees to be awarded.

¶56 Affirmed in part, reversed in part and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE